# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

No. 14-2274

---

## UNITED STATES,

*Plaintiff-Appellant*,

*v.*

## DTE ENERGY CO. AND DETROIT EDISON CO.

*Defendant-Appellees*.

---

On Appeal From The U.S. District Court
For The Eastern District Of Michigan, No. 10-13101
(Hon. Bernard A. Friedman).

---

## OPENING BRIEF FOR PLAINTIFF-APPELLANT UNITED STATES

SAM HIRSCH
Acting Assistant Attorney General

*Of Counsel:*

MELINA WILLIAMS
SABRINA ARGENTIERI
  U.S Environmental
  Protection Agency
  1200 Pennsylvania Ave.
  Washington, DC  20640

JASON A. DUNN
KRISTIN M. FURRIE
KATHERINE J. BARTON
THOMAS A. BENSON
  U.S. Department of Justice
  Environment & Nat. Res. Div.
  Washington, DC 20044-7611
  (202) 514-5261

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ......................................................................v

GLOSSARY ...........................................................................................x

CLEAN AIR ACT CODIFICATION GUIDE ........................................x

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................xi

JURISDICTIONAL STATEMENT ..................................................... xii

STATEMENT OF THE ISSUES...............................................................1

INTRODUCTION ....................................................................................2

STATEMENT OF THE CASE...................................................................4

      A.     Statutory And Regulatory Background........................................4

           1.     NSR Preconstruction Requirements ...................................5

           2.     Determining NSR Applicability .......................................7

           3.     Sources Construct At Risk.............................................10

           4.     Enforcement ..................................................................11

      B.     Factual Background....................................................................12

           1.     Monroe 2 Overhaul.........................................................12

           2.     Post-Construction Emissions ..........................................15

           3.     Harm From Monroe 2's Pollutants ..................................15

C.    Procedural History..............................................................17

    1.    This Court's Decision .................................................17

    2.    The Second Summary Judgment Decision By The
    District Court ...............................................................19

STANDARD OF REVIEW ...................................................................21

SUMMARY OF ARGUMENT .............................................................22

ARGUMENT ......................................................................................24

I.    EPA'S ENFORCEMENT AUTHORITY INCLUDES THE ABILITY TO
    CHALLENGE DTE'S PROJECTION IN THIS CASE.....................................24

    A.    EPA Has Authority To Enforce Where Sources Fail To
    Perform A Reasonable Projection Under The Regulations .......26

    B.    This Court's Prior Opinion Recognizes That EPA Can Bring
    An Enforcement Action Where A Source Fails To Follow
    The Regulations By Making An Unreasonable Projection........30

    C.    The United States Proffered Sufficient Evidence To Show
    That DTE Failed To Comply With The Regulations.................32

    1.    DTE has never offered any support for its claim that
    the demand growth exclusion applies..............................32

    2.    DTE's own preconstruction analysis demonstrates
    that a large portion of the projected increase resulted
    from the project ...............................................................36

    3.    EPA enforcement is appropriate here under this
    Court's prior decision .....................................................38

II.   AN NSR VIOLATION OCCURS WHEN A SOURCE CONSTRUCTS
      WITHOUT NECESSARY PERMITS AND CANNOT BE UNDONE BY
      POST-PROJECT DATA ................................................................42

      A.   An NSR Violation Occurs When A Source Is Modified
           Without An NSR Permit ...........................................................43

           1.   When a source constructs without the necessary
                permit, it violates the Act at the time of construction .....43

           2.   Preconstruction NSR applicability turns on what the
                source should have expected before construction ...........46

      B.   Once A Source Violates NSR, It Must Comply With The
           Substantive Requirements Of The Statute And Regulations .....48

           1.   A project that is a major modification based on
                preconstruction analysis cannot escape the
                modification requirements based on post-project
                events .............................................................................48

           2.   In a preconstruction program, post-project data does
                not trump preconstruction analyses .................................50

           3.   NSR requires enforceable preconstruction
                applicability to work as designated.................................52

III.  EPA HAS ALREADY ADDRESSED THE ISSUES RAISED BY THIS
      APPEAL, AND THIS COURT SHOULD DEFER TO EPA'S
      CONSTRUCTION OF THE NSR PROGRAM ................................54

CONCLUSION ................................................................................58

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION .....59

CERTIFICATE OF SERVICE ..............................................................60

RELEVANT DISTRICT COURT DOCUMENTS.................................61

# TABLE OF AUTHORITIES

## CASES:

*Alaska Dep't of Envtl. Conservation v. EPA*,
   540 U.S. 461 (2004) ............................................................. 6, 11, 30, 39, 54

*Alaska Wilderness League v. U.S. E.P.A.*,
   727 F.3d 934 (9th Cir. 2013) ....................................................... 57

*Am. Farm Bureau Fed'n v. E.P.A.*,
   559 F.3d 512 (D.C. Cir. 2009) ...................................................... 16

*Auer v. Robbins*,
   519 U.S. 452 (1997) .............................................................. 21, 57

*Briney v. Sears, Roebuck & Co.*,
   782 F.2d 585 (6th Cir. 1986) ....................................................... 29

*Burchett v. Kiefer*,
   310 F.3d 937 (6th Cir. 2002) ....................................................... 21

*CleanCOALition v. TXU Power*,
   536 F.3d 469 (5th Cir. 2008) ....................................................... 44

*Durflinger v. Artiles*,
   727 F. 2d 888 (10th Cir. 1984) ..................................................... 29

*Envtl. Def. v. Duke Energy Corp.*,
   549 U.S. 561 (2007) .............................................................. 4, 11, 28, 35

*Hawaiian Elec. Co. v. EPA*,
   723 F.2d 1440 (9th Cir. 1984) ....................................................... 5

*In re: Tenn. Valley Auth.*,
   2000 WL 1358648 (EAB Sept. 15, 2000) ............................................ 45, 56

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010) ................................................................ 29

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*,
   618 F. Supp. 2d 815 (E.D. Tenn. 2009) ............................................ 12, 45, 47

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.,*
    480 F.3d 410 (6th Cir. 2007) .............................................................. 5, 44, 56

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.,*
    502 F.3d 1316 (11th Cir. 2007) ......................................................44

*Nat'l-Southwire Aluminum Co. v. U.S. E.P.A.,*
    838 F.2d 835 (6th Cir. 1988) ..................................................... 7, 52

*New York v. EPA,*
    413 F.3d 3 (D.C. Cir. 2005) .......................................... 6, 9, 27, 35

*New York v. EPA,*
    443 F.3d 880 (D.C. Cir. 2006) .......................................................7

*New York v. EPA,*
    No. 02-1387, 2004 WL 5846442 (D.C. Cir. Oct. 26, 2004).........................46

*Sierra Club v. Otter Tail Power Co.,*
    615 F.3d 1008 (8th Cir. 2010) .......................................................44

*Talk America, Inc. v. Mich. Bell Tel. Co.,*
    131 S. Ct. 2254 (2011) ....................................................................57

*Tenn. Valley Auth. v. Whitman,*
    336 F.3d 1236 (11th Cir. 2003) .............................................. 45, 56

*Texas v. E.P.A.,*
    726 F.3d 180 (D.C. Cir. 2013) ............................................... 26, 44

*United States v. Ala. Power Co.,*
    730 F.3d 1278 (11th Cir. 2013) .................................... 11, 29, 37, 46

*United States v. Cinemark USA, Inc.,*
    348 F.3d 569 (6th Cir. 2003) ........................................................54

*United States v. Cinergy Corp.,*
    458 F.3d 705 (7th Cir. 2006) ................................. 18, 27, 28, 29, 47

*United States v. Cinergy Corp.,*
    618 F. Supp. 2d 942 (S.D. Ind. 2009).........................................16

*United States v. Cinergy Corp.*,
 623 F.3d 455 (7th Cir. 2010) ................................................... 11, 47

*United States v. Cinergy Corp.*,
 2005 WL 3018688 (S.D. Ind. Nov. 9, 2005) ...................................35

*United States v. DTE Energy Co.*,
 711 F.3d 643 (6th Cir. 2013) ................................................ passim

*United States v. Duke Energy Corp.*,
 5 F. Supp. 3d 771 (M.D.N.C. 2014) ................................. 12, 44, 47

*United States v. Duke Energy Corp.*,
 2010 WL 3023517 (M.D.N.C. July 28, 2010).......................... 30, 47

*United States v. EME Homer City Generation, L.P.*,
 727 F.3d 274 (3d Cir. 2013)...........................................................44

*United States v. La. Generating, LLC*,
 929 F. Supp. 2d 591 (M.D. La. 2012)................................. 12, 44, 47

*United States v. Louisiana-Pacific Corp.*,
 682 F. Supp. 1141 (D. Colo. 1988)...............................................52

*United States v. Midwest Generation, LLC*,
 720 F.3d 644 (7th Cir. 2013) ........................................... 10, 44, 48

*United States v. Ohio Edison Co.*,
 276 F. Supp. 2d 829 (S.D. Ohio 2003) .................................. 12, 34, 37, 45, 47

*United States v. S. Ind. Gas & Elec. Co.*,
 2002 WL 1629817 (S.D. Ind. July 18, 2002) ..................... 12, 45, 47

*United States v. Tocco*,
 306 F.3d 279 (6th Cir. 2002) .......................................................29

*United States v. Wendlandt*,
 714 F.3d 388 (6th Cir. 2013) .......................................................29

*Util. Air Regulatory Group v. EPA*,
 134 S. Ct. 2427 (2014)............................................................ 6, 26

*Wilson v. Commissioner of Social Sec.*,
    378 F.3d 541 (6th Cir. 2004) ........................................................................57

*Wis. Elec. Power Co. v. Reilly*,
    893 F.2d 901 (7th Cir. 1990) ........................................ 7, 40, 52, 55


## STATUTES:

Clean Air Act

42 U.S.C. § 7413(b) .........................................................................11

42 U.S.C. § 7470.................................................................................5

42 U.S.C. § 7475................................................................................43

42 U.S.C. § 7475(a)(1) ........................................................................6

42 U.S.C. § 7475(a)(2) ........................................................................6

42 U.S.C. § 7475(a)(3) .................................................................. 6, 53

42 U.S.C. § 7475(a)(6) ........................................................................6

42 U.S.C. § 7477................................................... 11, 30, 43, 49

42 U.S.C. § 7503.................................................................................6

42 U.S.C. § 7503(c)(1) ........................................................................6


## RULES AND REGULATIONS:

40 C.F.R. § 52.21 .................................................................................8

40 C.F.R. § 52.21(a)(2) ........................................................................8

40 C.F.R. § 52.21(a)(2)(iv) .................................................................19

40 C.F.R. § 52.21(a)(2)(iv)(a).............................................................8

40 C.F.R. § 52.21(a)(2)(iv)(b) ...........................................................10

40 C.F.R. § 52.21(a)(2)(iv)(c) ...................................................................10

40 C.F.R. § 52.21(b)(2) .............................................................................8

40 C.F.R. § 52.21(b)(2)(i) .........................................................................8

40 C.F.R. § 52.21(b)(2)(iii)(a) ...................................................................7

40 C.F.R. § 52.21(b)(23)(i) ........................................................................9

40 C.F.R. § 52.21(b)(41)(i) ........................................................................9

40 C.F.R. § 52.21(b)(41)(ii)(a) ................................................ 9, 26, 28, 39

40 C.F.R. § 52.21(b)(41)(ii)(c) ................................................ 9, 27, 34, 39

40 C.F.R. § 52.21(b)(48)(i) ........................................................................9

40 C.F.R. § 52.21(k) ................................................................................53

40 C.F.R. § 52.21(r)(1) ...................................................................... 45, 55

40 C.F.R. § 52.21(r)(6)(i)(c) .............................................................. 27, 33

57 Fed. Reg. 32,314 ...................................................... 10, 28, 34, 41

57 Fed. Reg. 5320 (Feb. 13, 1992) .........................................................56

61 Fed. Reg. 38,250 ..................................................... 9, 28, 33, 35, 37

67 Fed. Reg. 80,186 ........................................................................... 9, 55

68 Fed. Reg. 61,248 ................................................................................10

# GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| MDEQ | Michigan Department of Environmental Quality |
| CAA | Clean Air Act |
| NSR | New Source Review (including Prevention of Significant Deterioration and Nonattainment New Source Review programs) |
| PSD | Prevention of Significant Deterioration |
| BACT | Best Available Control Technology |
| SIP | State Implementation Plan |
| $NO_x$ | Nitrogen Oxides |
| $SO_2$ | Sulfur Dioxide |
| DTE | DTE Energy Co., including Detroit Edison Co. |
| ESGU | Electrical Steam Generating Unit (i.e. a power plant unit) |
| UARG | Utility Air Regulatory Group (a power plant trade association that includes DTE) |

## CLEAN AIR ACT CODIFICATION GUIDE

| **Clean Air Act Section** | **Codified at:** |
|---|---|
| § 111 - Definitions | 42 U.S.C. § 7411 |
| § 113 - Federal Enforcement | 42 U.S.C. § 7413 |
| § 165 - Preconstruction Requirements (PSD program) | 42 U.S.C. § 7475 |
| § 167 - Enforcement (PSD-specific) | 42 U.S.C. § 7477 |
| § 169 - Definitions (PSD-specific) | 42 U.S.C. § 7479 |
| § 171 - Definitions (Nonattainment-specific) | 42 U.S.C. § 7501 |
| § 173 - Permit requirements (Nonattainment-specific) | 42 U.S.C. § 7503 |
| § 304 - Citizen Suits | 42 U.S.C. § 7604 |

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Plaintiff-Appellant United States requests oral argument.  The issues presented here come from the interpretation of a statutory and regulatory regime of national importance.  The United States believes that the Court would likely benefit from the opportunity to fully discuss the issues raised on appeal at oral argument.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and entered final judgment pursuant to Fed. R. Civ. P. 54(b) on August 5, 2014.[1]  Order, RE 220, Page ID 7697-7700.  The United States filed a timely notice of appeal on October 3, 2014, and this Court has jurisdiction under 28 U.S.C. § 1291.  Plaintiff-Intervenor Sierra Club also filed a timely notice of appeal, which is proceeding as appeal No. 14-2275.

---

[1] Shortly after granting summary judgment to DTE, the district court granted motions by the United States and Sierra Club to amend their complaints to add claims related to additional construction projects.  Order, RE 202, Page ID 7558. The United States and Sierra Club then moved for entry of final judgment as to some, but not all, claims under Fed. R. Civ. P. 54(b), and the district court granted those motions.  RE 220, Page ID 7697-7700.  The district court stayed proceedings on the new claims pending this appeal.  *Id.*

## STATEMENT OF THE ISSUES

The Clean Air Act requires operators of major sources of air pollution to complete an extensive preconstruction review process and obtain New Source Review ("NSR") permits before implementing any major modifications at their facilities.  Such facilities must thereafter meet stringent emission limitations.  This appeal presents two issues concerning how the preconstruction requirements of NSR are implemented:

First, in an enforcement action, may the United States challenge an operator's preconstruction projection of air emissions based on the operator's failure to comply with the demand growth provisions of the NSR rules?

Second, if an operator should have complied with NSR major modification requirements before beginning construction, can post-project data erase NSR applicability and preclude an enforcement action?

**INTRODUCTION**

The Clean Air Act requires sources planning construction projects to undergo New Source Review before beginning work that should be expected to increase pollution. The NSR process includes setting pollution limits for post-construction operations and allowing for public participation regarding the proposed project, including its projected impact on air quality. To give meaning to the statute's requirement that NSR applicability be determined before construction, in this case's prior appeal this Court found that EPA may enforce when operators fail to properly assess whether their projects are subject to NSR requirements. *United States v. DTE Energy Co.*, 711 F.3d 643, 649 (6th Cir. 2013). Every court to address the issue has reached the same conclusion. Where an operator fails to follow the requirements of the regulations and "proceeds to construction, it is subject to enforcement proceedings." *Id*. Otherwise, New Source Review "would cease to be a preconstruction review program." *Id*. EPA therefore can bring enforcement actions to ensure that sources that should have obtained permits and installed pollution controls before constructing actually do so.

In 2010, DTE performed a $65 million overhaul at Monroe Unit 2, part of a coal-fired power plant in Monroe, Michigan. Before beginning the work, the company predicted that the unit would pollute significantly more after the overhaul than it had beforehand. DTE's own documents explained that the work would

allow the unit to run more by eliminating outages.  But DTE decided that a regulatory exemption known as the demand growth exclusion meant that its own predicted pollution increase did not count for NSR purposes.  DTE's application of the exclusion was legally incorrect and violated the NSR regulations.  Evaluated properly under the rules, DTE's own preconstruction NSR analysis shows an emissions increase that qualifies the Monroe 2 overhaul as a major modification.  That means the company should have obtained permits and installed pollution controls in 2010.

DTE did not.  When EPA challenged the company's compliance, DTE objected, saying that only post-project data could be used to show whether its $65 million overhaul was a major modification under the rules.  This Court already rejected that claim in the prior appeal.  *Id.*  Indeed, every court to consider the issue has reached the same conclusion: under the Clean Air Act, an NSR violation is ripe when construction begins without a permit.  Where a source should have complied before construction, courts must be able to enforce the major modification requirements after construction.

The district court improperly concluded that EPA was second-guessing DTE's projection of post-construction emissions.  This case should be remanded to the district court to determine whether DTE should have complied with the major modification requirements before beginning construction.

## STATEMENT OF THE CASE

### A. Statutory And Regulatory Background

This appeal concerns the Clean Air Act's New Source Review program.[2] Having determined that earlier programs "did too little" to achieve the nation's air quality goals, Congress added NSR provisions to the Act in 1977. *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567-68 (2007). NSR's requirements apply both to new sources and to existing sources that construct "major modifications" – including any non-routine physical change at a facility that will increase pollution by more than a certain amount. If a project qualifies, the source must, among other things, satisfy a series of preconstruction requirements, including undergoing public review, obtaining an NSR permit, and installing pollution controls. Projects qualify as a major modification in one of two ways. First, a project is a major modification where an operator predicts – or should predict – that post-construction pollution will increase as a result of the work. Second, a major modification also results where there is an actual increase in pollution (as shown

---

[2] NSR includes two complementary programs: Prevention of Significant Deterioration and Nonattainment New Source Review. Which program applies depends on whether an area meets applicable air quality standards. Here the area surrounding the Monroe plant meets standards for some pollutants but not for others, so both programs apply. Because the differences between the programs are not relevant to this appeal, we generally address them together in this brief.

by post-project data) because of the project.  The issue in this appeal is whether the Monroe 2 overhaul qualifies as a major modification based on what DTE should have expected before the work began, so this brief focuses on that aspect of NSR applicability.

### 1.  *NSR Preconstruction Requirements*

NSR protects air quality by imposing emissions limits and planning requirements before sources begin construction projects that would significantly increase air pollution.  This Court has identified two central purposes for NSR.  First, the program aims to "protect air quality" and "prevent increases in air pollution."  *DTE Energy*, 711 F.3d at 649, 651.  Second, NSR seeks to assure "that any decision to permit increased air pollution . . . is made only after *careful evaluation of all the consequences of such a decision*. . . ."  *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 412 (6th Cir. 2007) (emphasis added); *see also* 42 U.S.C. § 7470 (setting forth statutory purposes); *Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1446-47 (9th Cir. 1984) (noting that modified plants must also install modern pollution controls to reduce pollution).

To implement those goals, the Act includes a series of preconstruction requirements.  For instance, the operator proposing the project must:

- Undergo a review (including a public hearing) addressing factors including "the air quality impact of such source" and "alternatives thereto"

5

- Demonstrate that its emissions "will not cause, or contribute to, air pollution in excess of" various standards

- Undergo "an analysis of any air quality impacts projected for the area as a result of growth associated with such facility"

42 U.S.C. § 7475(a)(1), (2), (3), (6) (Prevention of Significant Deterioration

requirements); *see also* 42 U.S.C. § 7503 (similar requirements in nonattainment

areas); *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2443 (2014)

(describing preconstruction requirements for sources).  No qualifying project may

proceed without meeting the preconstruction requirements.  *Alaska Dep't of Envtl.*

*Conservation v. EPA*, 540 U.S. 461, 484 (2004).

    In areas where air quality standards are met, the operator must meet

emission limits based on the best available control technology and demonstrate that

the project will not impair local air quality beyond a certain "increment" set by

EPA.  *Id.* at 472-73.  Where air quality standards are not being met, the Act,

logically, requires more.  In such areas, the statute mandates that new or modified

sources meet the lowest available emission rate and obtain pollution reductions

from other sources to offset any increase in emissions from the project.  *See* 42

U.S.C. § 7503(c)(1); *New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005) (discussing

more stringent nonattainment NSR requirements).

    In deciding how to handle existing sources, Congress reached a compromise

that fostered both the statutory goal to prevent increases in air pollution and the

importance of balancing environmental goals with economic growth.  Congress allowed existing sources to continue operating without NSR permits, but if an operator plans a construction project that would result in increased pollution, the statute requires NSR compliance at that time.  *See Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990).

This arrangement supports the goal of preventing and minimizing increases in air pollution, while ensuring that pollution controls are installed at the time most efficient for the operator: when the source is already undergoing a modification. *Id.*; *see also National-Southwire Aluminum Co. v. U.S. E.P.A.,* 838 F.2d 835, 843 (6th Cir. 1988) (Boggs, J., dissenting) (internal citations omitted) *(*"The purpose of the 'modification' rule is to ensure that pollution control measures are undertaken when they can be most effective, at the time of new or modified construction.").

2. *Determining NSR Applicability*

Because New Source Review requires sources to obtain permits prior to construction, NSR applicability must initially be determined based on projections. There are two primary issues in determining whether a project constitutes a modification.  First, the work must be a non-routine physical change[3] (or change in

---

[3] EPA created an exemption from NSR for projects that are routine maintenance, repair, or replacement.  40 C.F.R. § 52.21(b)(2)(iii)(*a*).  That exemption must be narrowly construed to apply only to *de minimis* circumstances.  *New York v. EPA*, 443 F.3d 880, 890 (D.C. Cir. 2006).  The district court has not yet addressed

the method of operation).  40 C.F.R. § 52.21(b)(2)(i).[4]  Second, the work must be expected to result in a significant emissions increase.[5]  *Id.*  To answer the second question, an operator planning a construction project must predict its future emissions to determine whether NSR applies.  40 C.F.R. § 52.21(a)(2); *DTE Energy*, 711 F.3d at 647.  As defined by the rules, the key question in determining whether a project is an NSR-triggering modification is whether the work "would result in" a pollution increase.  40 C.F.R. § 52.21(b)(2).

EPA promulgated NSR rules in 1980.  To determine whether a project would constitute a major modification, those rules required comparing "baseline" actual emissions with maximum *potential* future emissions.  *See DTE Energy*, 711 F.3d at 645.  EPA changed that approach in 1992 for electric utilities and in 2002 for all sources.  *Id.* at 645-46.  Under the new regulations, determining whether a project is a modification involves comparing pre-project baseline actual emissions with predicted actual future emissions.  *Id.*  For the baseline, utilities like DTE can

---

whether DTE's $65 million overhaul was a non-routine physical change, and that issue is not before this Court.

[4] For convenience, we cite to NSR's Prevention of Significant Deterioration regulations at 40 C.F.R. § 52.21.  Both federal and Michigan rules apply here, but the relevant provisions are substantively the same.

[5] To trigger NSR, a projected emissions increase must also exceed the significance threshold after accounting for other emissions changes at the source.  40 C.F.R. § 52.21(a)(2)(iv)(*a*).  The specifics of that analysis, known as "netting," are not relevant to this action.

select a two-year period within the five years preceding the project.  40 C.F.R. § 52.21(b)(48)(i).  For the projection of future emissions, an operator must "consider all relevant information" to determine the "maximum annual rate, in tons per year, that the existing emission unit is projected to emit."  *Id*. § 52.21(b)(41)(i), (ii)(*a*).  For the pollutants at issue here, a predicted increase of 40 tons or more requires NSR compliance.  *Id*. § 52.21(b)(23)(i).

EPA's rules direct operators to exclude certain emissions from the projection.  *See id*. § 52.21(b)(41)(ii)(*c*).  The relevant provision is often referred to as the "demand growth exclusion."  Under the rules, an operator can exclude emissions from its projection *only* where those emissions (i) could have been accommodated in the selected baseline period and (ii) are unrelated to the project at issue.  *Id.*; *see also DTE Energy*, 711 F.3d at 645-46; *New York v. EPA*, 413 F.3d 3, 33 (D.C. Cir. 2005) (citing 67 Fed Reg. 80,186, 80,203 (Dec. 31, 2002)).  EPA's guidance explains that, to qualify as unrelated, emissions must be "completely unrelated to the project."  *See* EPA Northampton Letter, RE 114-7, Page ID 4895.  Where a proposed change will improve unit performance, EPA has stated that "increases in utilization that are projected to follow can and should be attributable to the change."  61 Fed. Reg. 38,250, 38,268 (July 23, 1996).

When EPA revised the rules in 1992/2002 to allow sources to determine NSR applicability based on projected actual emissions, it recognized that operators

9

might underestimate projections of future emissions. EPA addressed this concern by requiring post-construction reporting in some instances and adding provisions clarifying that a major modification also results if post-project data shows a significant increase in pollution related to the project. 57 Fed. Reg. 32,314, 32,325 (July 21, 1992); 40 C.F.R. § 52.21(a)(2)(iv)(*b*). Thus NSR applies if an operator should (or does) project an emissions increase, 40 C.F.R. § 52.21(a)(2)(iv)(*c*), or if the work results in an actual increase, *id*. § 52.21(a)(2)(iv)(*b*).

### 3. *Sources Construct At Risk*

As noted in this Court's prior opinion, the rules do not require operators to get EPA approval of their projections before proceeding with construction. However, the absence of an approval requirement does not mean sources get a safe harbor once construction begins. EPA has explained that operators that construct without a permit "*proceed at risk*." 68 Fed. Reg. 61,248, 61,250 (Oct. 27, 2003) (emphasis added); *see also United States v. Midwest Generation, LLC*, 720 F.3d 644, 646 (7th Cir. 2013) (describing construction without a permit as "a risky strategy" because a source could be required to perform further work and pay a large penalty). As EPA stated in promulgating the 2002 NSR rules: "If you are subsequently determined not to have . . . properly project[ed] emissions . . . you will be subject to any applicable enforcement provisions." 67 Fed. Reg. at 80,190.

*4. Enforcement*

The Act provides EPA with two judicial enforcement tools.  The Act's general enforcement provision authorizes EPA to bring a civil action against any person who "has violated, or is in violation of" any requirement of the applicable regulations or the Act.  42 U.S.C. § 7413(b).  Under this provision, EPA has authority to enforce compliance with the preconstruction permitting requirements of the Act and the analogs in state law.  Congress also enacted a special enforcement provision for PSD that – in "notably capacious terms" – authorizes EPA to prevent construction or modification of sources that fail to comply with PSD.  *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 484; 42 U.S.C. § 7477.

In a series of post-construction enforcement actions, courts have endorsed EPA's authority to bring claims based on what the source "expected, or should have expected . . . at the time of the projects."  *See, e.g.*, *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013); *see also Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 571 (2007) (noting claims based on allegation that projects "would have been projected to result" in increased operation); *United States v. Cinergy Corp.*, 623 F.3d 455, 459 (7th Cir. 2010) (noting question was whether construction "would result in an increase . . . 'Would,' not 'did,' because the permit must be obtained before the modification is made, and so the effect on emissions is a prediction rather than an observation."); *United States v. Duke*

*Energy Corp.*, 5 F. Supp. 3d 771, 782 n.6 (M.D.N.C. 2014); *United States v. La.*

*Generating, LLC*, 929 F. Supp. 2d 591, 593 (M.D. La. 2012); *Nat'l Parks*

*Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 829 (E.D.

Tenn. 2009)*; United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 865, 881

(S.D. Ohio 2003); *United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692 C-M/F,

2002 WL 1629817, at *2-3 & n.3 (S.D. Ind. July 18, 2002).

## B. Factual Background

### 1. *Monroe 2 Overhaul*

In March 2010, DTE began a massive construction project at Monroe 2.  The

company spent $65 million to make a series of improvements at the unit, including

replacing the economizer and reheater, two major components of the unit's boiler.

The purpose of the replacements was to increase the unit's "availability" – the

amount of time it was available to run.  SJ Opp., RE 181-1, Page ID 7053-7054;

*see also* DTE Project Documents, RE 181-3, Page ID 7082, 7084; DTE

Economizer PowerPoint, RE 60 (Sealed) at 2-4, 7-10; DTE Reheater PowerPoint,

RE 61 (Sealed) at 2-4, 6-8.

Before beginning the project, DTE performed an NSR analysis.  For its

projected post-construction emissions, DTE selected estimates it had previously

used in filings provided to the Michigan Public Service Commission as part of the

Power Supply Cost Recovery process.  SJ Motion, RE 166, Page ID 6715.  The

Power Supply Cost Recovery process allows DTE to submit estimates of its future fuel costs to the state in order to recover those costs from customers. DTE developed the projections it used in those state filings and for NSR purposes using a "sophisticated" computer model known as PROMOD. *Id.* Based on "exhaustive" input data, including estimates of future outage rates, coal prices, demand, and many other factors, the model predicts how much each unit will run in the future and the pollution from that unit. *Id.* DTE told the district court that the projection it developed using PROMOD and submitted to the state in the Power Supply Cost Recovery process was "the Company's best estimate." *Id.*

Based on that estimate, DTE's NSR analysis showed large predicted increases in pollution at Monroe 2 after the project, as compared to the baseline period. DTE Notice Letter to Michigan, RE 8-6, Page ID 168. The company predicted peak pollution in 2013, with emissions increases of 4096 tons of nitrogen oxides and 3701 tons of sulfur dioxide – well over the 40 tons necessary to trigger NSR. *Id.* The same DTE "best estimate" modeling also predicted pollution increases in 2011 and 2012 that were smaller than in 2013, but still well above 40 tons. DTE Letter to EPA, RE 8-9, Page ID 183.

At the time of construction, DTE contended that all emissions over baseline levels could be excluded, telling the state permitting authority that it "excluded from the PROMOD projections 'that portion of the unit's emissions following the

13

project that an existing unit could have accommodated . . . and that are also unrelated to the particular project.'" DTE Notice Letter to Michigan, RE 8-6, Page ID 165 (quoting from Michigan analog of the demand growth exclusion). That is, DTE contended that the demand growth exclusion rule rendered all of its projected emissions increases irrelevant for NSR purposes. DTE, however, provided no support for its claim that it met the demand growth exclusion requirements. DTE went on to tell the state that even if pollution increased in the future, it would "not [be] as a result of" the overhaul, but would be because of market conditions. *Id.* DTE regularly asserted the demand growth exclusion using the same boilerplate language, as illustrated by the company's 2005 notification for the previous major outage at Monroe 2. *See* DTE 2005 Notice Letter to Michigan, RE 114-5, Page ID 4820 (unsupported statement excluding emissions and attributing future utilization to market conditions). When deposed in this case, DTE's lead environmental engineer acknowledged that DTE simply did not "believe" that replacing boiler components like those at issue in this case could result in related emissions increases. Rugenstein Deposition Excerpts, RE 115-3 (Sealed), Transcript pp. 166-167.

### 2. *Post-Construction Emissions*

As it happened, pollution decreased in the years immediately after DTE's project at Monroe 2 for two unexpected reasons. First, the United States brought this case, filing the complaint shortly after the work concluded, and the district court shortly thereafter issued an order limiting DTE to baseline pollution levels. Order, RE 29, Page ID 1005-1006. DTE was forced to temporarily limit its emissions so that there would be no annual pollution increase while this case was pending before the district court. *Id.* Second, demand for electricity decreased during the recession, particularly in the Detroit area that DTE serves. *See* SJ Reply Brief, RE 183, Page ID 7174. These unexpected factors do nothing to show that DTE was wrong in expecting pollution from Monroe 2 to increase when it performed the unit overhaul.

### 3. *Harm From Monroe 2's Pollutants*

Monroe 2 emits oxides of nitrogen ("$NO_X$") and sulfur dioxide ("$SO_2$"). Each pollutant is harmful in its own right, and once they reach the air around the plant, they mix with other pollutants to form fine particulate matter. Declaration of Lyle Chinkin, RE 8-2, Page ID 81-83. Some of these particles are much smaller than a human hair or a grain of beach sand and are known as PM2.5 because they are smaller than 2.5 microns (each micron is one thousandth of a millimeter). *Id.* Because of their tiny size, these microscopic particulates are readily inhaled and

can lodge deep in a person's lungs. Declaration of Joel Schwartz, RE 8-23, Page ID 509.

Such particulates cause some of the most serious harm from air pollution, including early death and increased incidence of heart attacks, chronic bronchitis, stroke, and respiratory ailments like asthma. *United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 949-50 (S.D. Ind. 2009) (listing scientific and medical groups in agreement); *Am. Farm Bureau Fed'n v. E.P.A.*, 559 F.3d 512, 515 (D.C. Cir. 2009); Declaration of Joel Schwartz, RE 8-23, Page ID 509.

Had DTE complied with NSR, it would have been required to install pollution controls at Monroe 2 at the time of the 2010 modification. Those controls would have reduced $NO_X$ emissions by at least 90% and $SO_2$ emissions by 95% or more. Declaration of Ranajit Sahu, RE 8-13, Page ID 236; DTE Press Release, RE 8-14, Page ID 251-252. Compared to the unit's pre-modification pollution, installing controls would eliminate about 8,000 tons of $NO_X$ and 26,500 tons of $SO_2$ each year. Declaration of Ranajit Sahu, RE 8-13, Page ID 236-237. Eliminating that pollution would result in 90 fewer deaths and overall health benefits to downwind communities worth more than $500 million each year. Declaration of Joel Schwartz, RE 8-23, Page ID 507.

## C. Procedural History

The United States filed its complaint against Detroit Edison on August 5, 2010 and moved for a preliminary injunction the next day.  Complaint, RE 1, Page ID 1-17; Motion for Preliminary Injunction, RE 8, Page ID 25-72.  The complaint alleged that DTE violated NSR by proceeding to construction without obtaining NSR permits.  Shortly thereafter, the district court ordered DTE to limit emissions to no more than baseline levels during the pendency of the case.  Order, RE 29, Page ID 1005-1006.  Meanwhile, Sierra Club filed a motion to intervene, and the district court granted that motion on November 23, 2010.  Order, RE 64, Page ID 2355-2356.

DTE moved for summary judgment in June 2011, near the close of discovery.  2011 SJ Motion, RE 107, Page ID 4667-4699.  The company argued – for the first time – that under the applicable rules it could not be liable unless actual post-project data showed an emissions increase.  The district court agreed, and the United States appealed.

### 1. *This Court's Decision*

On appeal, this Court reversed, holding that EPA had the authority to challenge an operator's preconstruction analysis, even where there was no post-project pollution increase.  The Court explained that the NSR program "depends on operators' making *accurate projections* before embarking on construction

17

projects." 711 F.3d at 649 (emphasis added). To ensure that operators comply

with the obligation to fairly assess their NSR applicability before construction, the

Court continued, EPA must have authority to enforce deviations from the rules.

The Court was careful not to invite EPA "second-guess[ing]" that would create a

*de facto* system of prior approval for construction projects. *Id*. at 649. With that

caution, this Court concluded that EPA must be able to review operators'

preconstruction analyses: "A preconstruction projection is subject to an

enforcement action by EPA to ensure that the projection is made pursuant to the

requirements of the regulations." 711 F.3d at 652. Without that enforcement

authority, NSR "would cease to be a preconstruction review program." *Id*. at 649.

This Court also rejected the argument made by DTE and adopted by the

district court that the 2002 NSR rules revamped the program for utilities like DTE.

Instead, the Court described the 2002 revisions as expanding the 1992 provisions

to non-utility sources, while also refining certain things. *Id*. at 646. The overall

effect was "minor changes" to the rules for utility units like Monroe 2. *Id*. In

describing the NSR program, the Court equated the two sets of rules. *Id*. at 649

(describing how "the 1992 and 2002 changes" to the rules operate); *see also United

States v. Cinergy Corp.,* 458 F.3d 705, 708 (7th Cir. 2006) (noting that any

difference between the 1992 and 2002 rules "would not affect our analysis"). The

Court thus gave no credence to DTE's claim on appeal that certain sentences in 40

C.F.R § 52.21(a)(2)(iv) – as revised in 2002 – dramatically recast NSR enforceability.

Chief Judge Batchelder dissented. The dissent described the majority opinion as holding that EPA "may challenge the operator's preconstruction emissions projections, regardless of actual emissions." 711 F.3d at 652. The dissent observed that the majority held that, "USEPA must be able to challenge the accuracy of the operator's scientific or technical preconstruction projections," and "remand[ed] the case for renewed (further) proceedings in the district court on that basis." *Id*. at 653. Chief Judge Batchelder found that the fact that emissions had decreased in the first calendar year following the project rendered the case moot "because there was, conclusively, no major modification." *Id*.

2. *The Second Summary Judgment Decision By The District Court*

On remand, DTE immediately moved again for summary judgment, arguing that this Court's prior decision compelled dismissal of the United States' claims. DTE argued that it had complied with all the requirements for its preconstruction analysis, and that the United States' action was simply impermissible "second-guessing." SJ Motion, RE 166, Page ID 6717-6719.

The United States responded by explaining that its action did not constitute "second-guessing" because DTE failed to apply the demand growth exclusion "according to the requirements . . . contained in the regulations." *DTE Energy*, 711

F.3d at 649.  Specifically, DTE failed to heed the regulation's mandate that the exclusion can only apply to the portion of a predicted increase that is *unrelated* to the work at issue.  The United States noted that DTE has never provided evidence that the increase was unrelated to the project, and thus failed to make out even a *prima facie* case for the exclusion.  SJ Opp., RE 181-1, Page ID 7067.  Moreover, the United States presented evidence, which DTE did not dispute, that (1) DTE's own computer modeling showed that the company's predicted increase was related to the construction and (2) DTE simply did not "believe" that boiler component replacement projects could affect emissions, even as the company's own documents justifying the project described how it would result in more power generation.  *Id.* at Page ID 7054-7056, 7065-7067.  Thus DTE's own analysis, when reviewed according to the requirements of the NSR rules, showed a triggering emissions increase.  *Id.* at Page ID 7055-7056.

The district court granted DTE's motion.  The district court found that this Court's prior decision allowed EPA only to conduct a "surface review" or "cursory examination" of a source's projection and found that the United States did not contend that DTE violated a regulation, but merely objected to "*the extent* to which [DTE] relied on the demand growth exclusion."  SJ Decision, RE 196, Page ID 7514-7515 (emphasis in original).  The district court did not address DTE's own modeling showing that the company did not satisfy the regulatory requirement that

20

only emissions increases "unrelated" to the project qualify for the demand growth exclusion. Rather, the court concluded that the regulations do not require operators "to demonstrate the propriety of their demand growth exclusion calculations," and thus the United States' enforcement action could not survive DTE's summary judgment motion. *Id.*

The district court went on to say that even if EPA had authority to pursue an enforcement action here, it could not show that the Monroe 2 overhaul was a major modification. In the district court's view, actual data showed the United States' projections – which were actually DTE's projections – "are now verifiably inaccurate." *Id*. at Page ID 7515-7516. For that reason, the district court found the United States could not prove that the project was a major modification.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Burchett v. Kiefer*, 310 F.3d 937, 941 (6th Cir. 2002). When examining a regulation promulgated by an agency, the Court defers to the agency's interpretation unless it is "plainly erroneous or inconsistent with" the regulation. *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

## SUMMARY OF ARGUMENT

NSR is a preconstruction program, and DTE failed to follow the preconstruction requirements.  Had it done so, the company would have obtained NSR permits and installed pollution controls before beginning construction in 2010.  The district court erroneously held that EPA's enforcement action was barred by this Court's prior opinion in this case, and that DTE could not be compelled to comply with NSR requirements until actual emissions increased.  That conclusion misapprehends this Court's prior decision and cannot be reconciled with the statute or NSR case law.  The case should be remanded for the district court to decide whether DTE would have triggered NSR had it followed the rules before construction.

1.    This enforcement action is appropriate under this Court's prior decision.  The NSR regulations require operators to base their projections on all relevant information and exclude only projected emissions that are unrelated to the construction (among other requirements).  DTE failed to comply on both counts.  EPA presented evidence to the district court that the company *ignored* the relevant information, and as a result it excluded the entire projected increase, including increases related to the project.  EPA thus did not "second-guess" DTE's projection, but showed that it did not comply with the regulations.  Indeed, in the proceedings below, DTE presented *no* evidence to support its approach – rather,

the very computer modeling the company relied upon shows that DTE erred in its analysis.  Instead, DTE's theory (adopted by the district court) was simply that EPA may not seek review of DTE's projection because it would constitute impermissible second guessing.  The effect of DTE's argument is that a source can bypass preconstruction permitting merely by saying it has followed the regulations.  Such a result renders meaningless the Act's enforcement provisions and this Court's holding that EPA may enforce when a source fails to follow the rules.

2.    For the NSR program to work as designed, a source's modification status must initially be determined before construction.  If a project is a major modification, the operator must comply with a series of statutory and regulatory requirements.  If it begins construction without satisfying those requirements, the source has violated the law.  Had DTE properly characterized its projected emissions before construction, it would have obtained permits and installed pollution controls at that time.  The failure to comply means DTE violated the statute and regulations at the time of construction and continues to do so today.  Post-project data cannot undo that violation.

# ARGUMENT

## I.    EPA'S ENFORCEMENT AUTHORITY INCLUDES THE ABILITY TO CHALLENGE DTE'S PROJECTION IN THIS CASE

The district court erred in ruling that the United States is barred from challenging DTE's emissions projection as a matter of law.  Neither the statute, EPA's regulations, nor this Court's prior decision supports that result.  While this Court's prior opinion said that EPA cannot "second guess" the making of DTE's projections, this Court also recognized that the agency is not completely prohibited from examining sources' preconstruction analyses.  *DTE Energy*, 711 F.3d at 649, 652.  Indeed, this Court said, "A preconstruction projection is subject to an enforcement action by EPA to ensure that the projection is made pursuant to the requirements of the regulations."  *Id.* at 652.  That is precisely what EPA seeks to do here – in response to DTE's motion for summary judgment, the United States proffered evidence that DTE's application of the demand growth exclusion violates express regulatory requirements.  Specifically, the United States' evidence shows that the projection is not based on the relevant information, as required by the regulations, including specific data and expectations that the company had at the time.  Rather, the United States' evidence, which DTE did not dispute, shows that DTE's own "sophisticated" computer modeling projected a significant increase in emissions resulting from the construction project, not simply from an increase in demand.  DTE thus violated the regulatory requirement that only emissions

24

"unrelated" to the project may be excluded due to demand growth. This evidence demonstrates that if DTE had followed the rules, it would have been required to get an NSR permit and install the required pollution controls before undertaking its project.

Under DTE's theory, EPA's evidence is irrelevant because DTE has asserted, in self-serving and unsupported statements, that the demand growth exclusion excuses the entire projected emissions increase. Neither the statute nor this Court's prior decision allows a regulated entity to avoid an enforcement challenge by simply asserting that it complied with regulatory requirements. Rather, as courts have unanimously concluded, the regulations require companies to make projections based on the relevant data and the company's actual expectations for future operations – regulations that are plainly violated where, as here, the company's own information and projections contradict its bare assertions of compliance. EPA's evidence does not constitute "second-guessing" of DTE's projection under this Court's prior opinion; rather, the evidence demonstrates that DTE did not make projections in accordance with the regulatory requirements. Moreover, this Court's prior, generalized statements about the scope of EPA's authority can only fairly be given specific meaning in the context of examining the particulars of an enforcement action.

## A. **EPA Has Authority To Enforce Where Sources Fail To Perform A Reasonable Projection Under The Regulations**

As this Court recognized in its prior decision, EPA may bring suit to enforce NSR preconstruction permitting requirements when a company fails to follow the applicable regulations. The Clean Air Act "unambiguously prohibit[s] a major emitting facility from commencing construction without a PSD permit . . . and § 167 unambiguously authorize[s] EPA to enforce that prohibition." *Texas v. E.P.A.*, 726 F.3d 180, 190 (D.C. Cir. 2013) (overturned in part on other grounds by *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2443 (2014)).

The regulations governing projections begin with the express requirement that the company "consider all relevant information" in making its projections. *See* 40 C.F.R. § 52.21(b)(41)(ii)(a). "[A]ll relevant information" includes but is not limited to "historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved State Implementation Plan." *Id*. § 52.21(b)(41)(ii)(*a*). In other words, the company cannot project nonsense; it cannot base its prediction on mere beliefs or surmises or hopes. It must base its projections on data and other information, including the company's actual expectations, from which it must make "a reasonable estimate of the amount of

additional emissions that the change will cause." *United States v. Cinergy Corp.,* 458 F.3d 705, 709 (7th Cir. 2006).

As pertinent here, making that projection consists of a two-step process. First, the company projects the total emissions anticipated to occur during the relevant time period after the project. Next, the rules state that a source shall exclude certain emissions from the final calculation. An operator excludes from the projection those emissions that (1) "could have been accommodated" in the baseline period and (2) "are also unrelated to the particular project." 40 C.F.R. § 52.21(b)(41)(ii)(*c*); *see also DTE Energy*, 711 F.3d at 650. This provision is often referred to as the demand growth exclusion. The rules require the operator to document its demand growth exclusion claim before beginning construction, including recording the amount of emissions excluded and the basis for exclusion. 40 C.F.R. § 52.21(r)(6)(i)(*c*). The burden for demonstrating that any projected emissions can be excluded rests with the operator. Jury Instructions in *United States v. Cinergy Corp.*, RE 8-20, Page ID 433 ("The burden is on Defendants to prove by a preponderance of the evidence that the demand growth exclusion applies to an emissions increase."); *see also New York v. EPA*, 413 F.3d 3, 33 (D.C. Cir. 2005) (noting "two criteria *a source must meet* before excluding emissions") (emphasis added).

27

EPA has provided guidance on what it means to be "unrelated" to the project. Any increase "attributable" to a change "must continue to be included" in the operator's projection. 57 Fed. Reg. 32,314, 32,326 (July 21, 1992). Therefore, to exclude any portion of a projected emissions increase the emissions must be "completely unrelated to the project." EPA Northampton Letter, RE 114-7, Page ID 4895. Where a "proposed change will increase reliability, lower operating costs, or improve other operational characteristics of the unit, increases in utilization that are projected to follow can and should be attributable to the change." 61 Fed. Reg. 38,250, 38,268 (July 23, 1996); *see also Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 580 (2007) (noting long-standing EPA guidance requiring NSR scrutiny where plans to increase operation are intertwined with work). These determinations – as to increases in reliability, reduction in operating costs, etc. – like all other aspects of the projection of actual emissions, must be based on "relevant information." *See* 40 C.F.R. § 52.21(b)(41)(ii)(*a*).

Where a company's projection of actual emissions increases is not reasonably based on relevant information, it violates the regulations. An operator need not be "prescient," but if it fails to make a reasonable projection that comports with EPA's rules and guidance, it is subject to an enforcement action upon construction. *See Cinergy,* 458 F.3d at 709 (EPA regulations require "a reasonable estimate of the amount of additional emissions that the change will

28

cause"); *see also* pp. 11-12 (listing unanimous cases describing standard as what operator should have expected before construction).

To be sure, in an enforcement action, the United States bears the burden to show such non-compliance. To prove a major modification, the United States "[must] show that at the time of the projects [the company] expected, or should have expected, that its modifications would result in a 'significant net emissions increase.'" *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013). The United States would have to prove by a preponderance of the evidence that a reasonable power plant operator would have expected the overhaul to result in a significant emissions increase had it followed the rules. *See, e.g.*, *Cinergy Corp.*, 458 F.3d at 709. This objective standard is akin to many other standards that call on courts to look back at what a reasonable person would have expected at the time a triggering event occurred.[6] Making the necessary NSR "determination of

---

[6] Perhaps the most common example is the test for negligence, in which the fact-finder must ask, "What would a reasonable and prudent person, confronted by like circumstances and exercising reasonable care, have done?" *Durflinger v. Artiles*, 727 F. 2d 888, 899 (10th Cir. 1984). Other examples abound in the law. *See, e.g., Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 646 (2010) (describing discovery rule as allowing claim to accrue when injured party knew or should have known of facts giving rise to claim); *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (sentencing guidelines for mortgage fraud require court to assess monetary harm defendant "knew or, under the circumstances, reasonably should have known," was possible to result); *Briney v. Sears, Roebuck & Co.*, 782 F.2d 585, 587-88 (6th Cir. 1986) (question in product liability case whether harm was "reasonably foreseeable"); *United States v. Tocco*, 306 F.3d 279, 286 (6th Cir.

reasonableness is well within the jurisdiction of the Court." *United States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517, *6 (M.D.N.C. July 28, 2010); *see also* pp. 11-12 (listing cases).

### B. This Court's Prior Opinion Recognizes That EPA Can Bring An Enforcement Action Where A Source Fails To Follow The Regulations By Making An Unreasonable Projection

This Court's prior decision establishes that EPA may bring an enforcement action where an operator fails to follow the NSR rules: "A preconstruction projection is subject to an enforcement action by EPA to ensure that the projection is made pursuant to the requirements of the regulations." 711 F.3d at 652. The Court noted that the Clean Air Act "'lodges in the Agency encompassing supervisory responsibility over the construction and modification of pollutant emitting facilities." 711 F.3d at 649-50 (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 484 (2004)). And the Court explained that EPA has authority over both the statutory and regulatory requirements, including the Act's explicit statutory directive to prevent modifications that fail to comply with those requirements. *Id.*; *see also* 42 U.S.C. § 7477.

EPA's enforcement authority includes challenging a company's projection of post-construction emissions where the projection deviates from the rules. The

---

2002) (sentencing guidelines in racketeering case require assessing "all reasonably foreseeable acts and omissions" of others).

Court found that "the operator has to make a projection in compliance with how the projections are to be made," and that "[i]f the operator does not do so, and proceeds to construction, it is subject to an enforcement proceeding." *DTE Energy*, 711 F.3d at 649. The Court recognized that "[i]f there is no projection, or the projection is made in contravention of the regulations guiding how the projections is to be made, then the system is not working." *Id*. Among the regulatory requirements, the Court noted, is that operators projecting post-project emissions must "consider all relevant information." *Id*. at 650. That is because the NSR program "depends on operators' making *accurate projections* before embarking on construction projects." *Id*. at 649 (emphasis added).

The prior panel expressed concern about what it perceived to be EPA's attempt to impose a prior approval scheme. EPA's actions here do not do so. Rather, they seek adherence to the regulatory requirements and procedures. Indeed, the prior panel specifically recognized that EPA's authority to enforce against unreasonable or noncompliant projections extends to the demand growth exclusion. The Court noted that increases in emissions satisfy the demand growth exclusion regulations only if they "could have been accommodated during the baseline period and are unrelated to the project." *Id*. at 650. And this Court concluded that whether those requirements are met and the demand growth

exclusion applies "is a fact-dependent determination that must be resolved on a case-by-case basis." *Id*. at 646.

### C. __The United States Proffered Sufficient Evidence To Show That DTE Failed To Comply With The Regulations__

The district court erred in dismissing the United States' enforcement action as a matter of law.  At a minimum, the United States' evidence presents a *prima facie* case that DTE failed to comply with the regulations in making its NSR projection for the Monroe 2 overhaul.  The company did not base its projection on the relevant information.  Indeed, the United States' evidence shows that DTE's own contemporaneous analysis predicted an emissions increase related to the project.

#### 1. *DTE has never offered any support for its claim that the demand growth exclusion applies*

DTE has never provided an explanation for excluding its entire predicted emissions increase under the demand growth exclusion.  At the time of the project, DTE sent state regulators a letter informing them of the imminent outage for the overhaul.  DTE Notice Letter to Michigan, RE 8-6, Page ID 164.  In that letter, DTE simply asserted that the exclusion applied, without any factual support.  *Id*. at Page ID 165.  The company excluded every ton of projected emissions over baseline levels and even told the state that any *future* pollution increase would "not [be] as a result of this outage." *Id*.  Notably, the NSR rules require sources to

document "an explanation for why such amount was excluded." 40 C.F.R. §
52.21(r)(6)(i)(*c*). When it began construction, DTE had none.[7]

During discovery, the company explained why. DTE's lead environmental
engineer admitted that the company simply did not "believe" that a boiler
component replacement project – like the economizer replacement at issue here –
could result in a related emissions increase. Rugenstein Deposition Excerpts, RE
115-3 (Sealed), Transcript pp. 166-167. That unsupported belief was contradicted
as a matter of fact by DTE's own project justification documents, and as a matter
of law by EPA's regulations. EPA has explained that where a change is expected
to improve unit performance, as here, the emissions "that are projected to follow
can and should be attributable to the change." 61 Fed. Reg. 38,250, 38,268 (July
23, 1996). DTE's project justification stated that it expected the project to improve
unit performance, making the associated predicted emissions increase related to the
project. *See* DTE Project Documents, RE 181-3, Page ID 7082, 7084; DTE
Economizer PowerPoint, RE 60 (Sealed) at 2-4, 7-10; DTE Reheater PowerPoint,
RE 61 (Sealed) at 2-4, 6-8. DTE also ignored the results of NSR enforcement

---

[7] In part of the district court's first summary judgment decision not challenged on
appeal, that court ruled that while DTE's explanation was "not very specific" it
found no provision in the notice provisions of the applicable NSR rules requiring
more. 2011 SJ Decision, RE 160, Page ID 6645. Whether DTE's bare bones
assertion violated the notice rules, it cannot serve to preclude EPA enforcement
since it fails to provide any support for DTE's claims.

cases concerning similar projects. *See, e.g.*, *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 834-35 (S.D. Ohio 2003) (finding liability for similar projects and noting that "projects were all intended to result in increased hours of operation as a result of a reduction in the number and length of forced outages . . . A significant decrease in outages results in a significant increase in both production and emissions.").

Four years later, DTE has still not even alleged facts sufficient to support a demand growth claim. The company offered one piece of record evidence to support its demand growth argument on summary judgment in district court: an affidavit from a company vice president stating that DTE "specifically determined that any increase in emissions . . . were *attributable* to demand growth. . . ." SJ Motion, Supplemental Declaration of Skiles Boyd, RE 166-5, Page ID 6798, ¶5.e (emphasis added).

The affidavit is insufficient for at least two reasons. First, DTE has no support for the assertion that the excluded emission increases were attributable to demand, despite its burden to document the exclusion. More importantly, DTE's *post hoc* declaration does *not* say that the projected increase was unrelated to the project, as explicitly required by the rules. *See* 40 C.F.R. § 52.21(b)(41)(ii)(*c*). In a situation where *both* demand and the project contribute to increased emissions, those emissions cannot be excluded. 57 Fed. Reg. 32,314, 32,326 (July 21, 1992);

34

61 Fed. Reg. 38,250, 38,268 (July 23, 1996); EPA Northampton Letter, RE 114-7,

Page ID 4895; *see also Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 580

(2007) (noting long-standing EPA guidance).  As one court explained in ruling that

an increase must be "completely unrelated" to the physical change in order to be

excluded, the exclusion only "applies to emissions increases that could have been

predicted or projected regardless of whether a physical change was to occur."

*United States v. Cinergy Corp.*, No. 199CV1693LJMVSS, 2005 WL 3018688, at

*3 (S.D. Ind. Nov. 9, 2005).  Thus if the "'increase is related to the changes . . .

then the emissions increases resulting from the increased operation must be

attributed to the modification project, and cannot be subtracted from the projection.

. .'"  *New York v. EPA*, 413 F.3d 3, 33 (D.C. Cir. 2005) (quoting EPA Technical

Support Document for 2002 rules at I-4-37, RE 114-6, Page ID 4881).

Indeed, if the fact that a projected increase was attributable in some way to

demand was alone sufficient to exclude the increase, it is hard to imagine when *any*

project would be subject to NSR – whether based on projections or post-project

actual emissions.  After all, plants do not operate unless there is demand.  *See New*

*York v. EPA*, 413 F.3d at 31-32 (citing EPA discussion in 63 Fed. Reg. 39,857

(July 24, 1998)).  The point of DTE's overhaul was to allow the Monroe plant to

operate more to meet demand that it otherwise could not meet.  That is *not* what

the demand growth exclusion allows an operator to exclude.

    2.  *DTE's own preconstruction analysis demonstrates that a large portion of the projected increase resulted from the project*

DTE's own contemporaneous documents show that it violated the NSR rules in making its projection, because the company's predicted emissions increase was due to the project.

In the computer modeling that DTE relied on for its NSR analysis, the company used model inputs reflecting the expectation that the work would improve Monroe 2's availability. Philip Hayet Expert Report, RE 181-7, Page ID 7130. In other words, DTE expected that Monroe 2 would break down less after the overhaul, and be able to run more. The model also predicted increased operation (and pollution) from Monroe 2. To test the theory that Monroe 2's increased operation in the model came from the predicted availability improvement, the United States reran DTE's model *without* the effects of the project while keeping all other inputs the same. *Id*. at Page ID 7128-7133. Such comparison runs are standard practice in the industry. *Id*. at Page ID 7134. Comparing the results of the model with and without the project showed that the overhaul "would result in a large portion of the emissions increase that DTE itself projected would follow the project." *Id*.

The analysis of the company's computer modeling confirmed what DTE has never disputed – that the Monroe 2 overhaul was expected to result in:

- Improved availability at Monroe 2;

- Increased generation at Monroe 2; and

- That much of the predicted increase was related to the project.

SJ Opp., RE 181-1, Page ID 7054-7056. DTE's contemporaneous documents showed the same thing. In justifying the overhaul to company executives, DTE engineers described the economizer as the biggest cause of breakdowns at the unit, and said that replacing such components would allow the unit to operate more in the future, generating more electricity. *See* DTE Project Documents, RE 181-3, Page ID 7082, 7084; DTE Economizer PowerPoint, RE 60 (Sealed) at 2-4, 7-10; DTE Reheater PowerPoint, RE 61 (Sealed) at 2-4, 6-8. That additional electricity provided the financial justification for performing the project – the work would pay for itself. *Id.* It also meant additional pollution, as reflected in DTE's projected increases.

That series of facts demonstrates a projected increase related to the project. 61 Fed. Reg. 38,250, 38,268 (July 23, 1996); *see also United States v. Ala. Power Co.*, 730 F.3d 1278, 1281 (11th Cir. 2013) ("If the repair or replacement of a problematic component renders a plant more reliable and less susceptible to future shut-downs, the plant will be able to run consistently for a longer period of time" resulting in additional pollution); *Ohio Edison*, 276 F. Supp. 2d at 834-35 (similar).

### 3. _EPA enforcement is appropriate here under this Court's prior decision_

Because DTE failed to follow the regulations, enforcement is appropriate under this Court's prior opinion, the statute, and the case law.  In seeking summary judgment below, DTE asserted that it met all the regulatory requirements and that any EPA review was prohibited "second-guessing" under this Court's prior decision.[8]  The district court agreed.  The district court erred in turning this Court's caution against EPA second-guessing into a prohibition on enforcement.

This Court explicitly contemplated EPA enforcement where operators fail to follow the regulations, while also explaining that EPA may not second-guess "the making of the projections" so as to create a _de facto_ "prior approval scheme."  711 F.3d at 649.  The district court concluded that meant EPA could only engage in a "cursory examination."  SJ Decision, RE 196, Page ID 7514-7515.  The district court's interpretation cannot be squared with NSR's statutory preconstruction focus and EPA's "encompassing supervisory responsibility over the construction and modification of pollutant emitting facilities'. . . ."  _DTE Energy,_ 711 F.3d at

---

[8] DTE also claimed that the United States had not alleged violations of the "projection regulations," and so the district court lacked jurisdiction.  SJ Reply, RE 183, Page ID 7175-7176.  This argument is unfounded, and the district court correctly ignored it.  The United States provided pre-suit notice that, "DTE is in violation of PSD requirements [under the Act and applicable rules] for constructing a major modification . . . without applying for or obtaining a PSD permit,"  EPA Notice of Violation, RE 8-8, Page ID 176, and made similar allegations in its complaint.

649-50 (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 484

(2004)).  As this Court explained, EPA can force operators to make projections,

and can ensure that they follow the legal requirements in making those projections.

*Id*. at 650.  A projection that fails to follow the rules is akin to no NSR analysis at

all: "If there is no projection, or the projection is made in contravention of the

regulations guiding how the projections is to be made, then the system is not

working."  *Id*. at 649.

The system did not work here because DTE failed to follow the rules in two

critical ways.  First, the company failed to make its projection based on "all

relevant information," as required by 40 C.F.R. § 52.21(b)(41)(ii)(*a*).  DTE used its

"best estimate" modeling for its preconstruction projection, but ignored that same

modeling in claiming that the predicted increase was unrelated to the project.

Instead, DTE relied on an unsubstantiated "belie[f]" that projects like those in the

2010 overhaul can never affect emissions.  SJ Opp., RE 181-1, Page ID 7065-

7066.  Relying on that self-serving belief while ignoring the actual modeling that

reflected the company's business expectations and filings with the Michigan Public

Service commission violated the NSR rules.  *See* 40 C.F.R. § 52.21(b)(41)(ii)(*a*).

That mistake led to DTE's second violation of the rules.  In applying the demand

growth exclusion, DTE excluded emissions related to the project, contrary to the

rules' requirements.  *See id*. § 52.21(b)(41)(ii)(*c*).

The district court erred in dismissing the United States' case. First, it appears that the district court never directly considered whether DTE violated the regulations. Instead, it found that the United States "does not contend" that DTE violated the rules but instead "takes defendants to task over *the extent* to which they relied upon the demand growth exclusion to justify their projections." SJ Decision, RE 196, Page ID 7515. That reading of the United States' argument is simply incorrect: the government did assert that DTE violated the regulations – not simply by excluding too much pollution, but by excluding a portion of the increase that the rules provide cannot be excluded. SJ Opp., RE 181-1, Page ID 7058, 7065-7067.

Second, the United States cannot be accused of second-guessing here. An operator cannot immunize itself from the very enforcement action that this Court previously recognized was permissible simply by stating that it satisfied the rules. To allow compliance through *ipse dixit* would threaten to make a sham of the emissions projection requirements. *See Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 917 (7th Cir. 1990) (EPA "cannot reasonably rely on a utility's own unenforceable estimate of its annual emissions."). Here, EPA's assertion of a regulatory violation is based not on second-guessing DTE's projection but on the manner in which DTE used its own information. DTE's demand growth analysis was based entirely on the company's own say-so – there was nothing to second-

guess.  Indeed, DTE's demand growth claim was contradicted by the company's documents justifying the work.  If an operator simply needs to assert that NSR does not apply to preclude an enforcement action, NSR "would cease to be a preconstruction review program."  *DTE Energy*, 711 F.3d at 649.  If an operator can assert that NSR does not apply when its own contemporaneous documents say the opposite, the program would become a farce.

Finally, the nature of an enforcement action here must be guided by this Court's specific discussion of the demand growth provisions.  This Court noted EPA's description of the demand growth exclusion as a "fact-dependent determination that must be resolved on a case-by-case basis."  *Id*. at 646 (citing 57 Fed. Reg. 32,314, 32,327 (July 21, 1992)).  Because the district court erroneously concluded that this enforcement action constituted inappropriate second guessing, the district court has never addressed our arguments and evidence that DTE failed to comply with the requirements of the regulations.  The case should be remanded for the district court to engage in that "fact-dependent" inquiry.

## II.    AN NSR VIOLATION OCCURS WHEN A SOURCE CONSTRUCTS WITHOUT NECESSARY PERMITS, AND CANNOT BE UNDONE BY POST-PROJECT DATA

In an alternative holding, the district court found that the fact that emissions happened not to increase after the project meant that the United States could not prove a major modification.  SJ Decision, RE 196, Page ID 7515-7516.  To the extent that this ruling reprises the district court's original summary judgment decision, this Court has already rejected it.  To the extent it suggests that an operator that constructs a major modification without an NSR permit can cure the violation through post-project data, the district court is incorrect.  Where a source should have expected a project to increase emissions, the work is a major modification and must meet the modification requirements.  That obligation cannot be erased by post-project data.  That is for good reason: to conclude otherwise would undermine the preconstruction permit and pollution control requirement. For example, it would encourage companies *not* to comply and gamble on what the future might show, depriving communities of the pollution control reductions the Act otherwise guarantees.  Moreover, where uncontrollable factors result in emissions reductions at facilities, companies that comply with preconstruction requirements and install expensive pollution control equipment are put at a competitive disadvantage compared to those who do not comply.

A. __An NSR Violation Occurs When A Source Is Modified Without An NSR Permit__

          1. _When a source constructs without the necessary permit, it violates the Act at the time of construction_

Because NSR establishes preconstruction requirements, the statute and case law make clear that applicability must be determined before construction. Sources must know whether they need to comply with the major modification requirements, and EPA must know whether it can exercise its authority to "prevent" such modifications under Section 167. 42 U.S.C. §§ 7475, 7477. This Court and others have unanimously recognized that an operator violates NSR when it constructs a major modification without a permit.

In a series of enforcement cases, the source claimed that NSR did not apply, and EPA or a citizens' group brought suit based on allegations of what the operator _should have expected_ at the time of construction. As this Court previously explained, if an operator fails to make its projections according to the requirements of the rules, "_and proceeds to construction_, it is subject to an enforcement proceeding." 711 F.3d at 649 (emphasis added). Courts have consistently held in NSR enforcement cases – based on the requirements of the Act – that NSR violations for constructing a major modification without a permit are ripe when construction begins. There is a split in authority over whether NSR violations are

continuing in nature,[9] but there is complete consensus that a violation occurs

"when construction commences without a permit in hand."  *United States v.*

*Midwest Generation, LLC*, 720 F.3d 644, 647 (7th Cir. 2013); *see also United*

*States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 284-85 (3d Cir. 2013)

(same); *Texas v. E.P.A.*, 726 F.3d 180, 190 (D.C. Cir. 2013); *Sierra Club v. Otter*

*Tail Power Co.*, 615 F.3d 1008, 1014 (8th Cir. 2010) ("PSD claims first accrued

upon commencement of the relevant modification"); *CleanCOALition v. TXU*

*Power,* 536 F.3d 469, 478 (5th Cir. 2008) ("violations of the preconstruction

permitting requirements occur at the time of construction."); *Nat'l Parks*

*Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 502 F.3d 1316, 1322-23 (11th Cir.

2007) (same).

       In addition to circuit precedent, a series of district court cases has held that a

source that should have expected an increase before construction is a major

modification no matter what post-project data shows.  *Duke Energy*, 5 F. Supp. 3d

at 782 n.6 ("the question is not whether Duke's plants *actually* had increased

emissions . . . but whether Duke *should have expected* its plants to have increased

emissions.") (emphasis added); *United States v. La. Generating, LLC*, 929 F. Supp.

---

[9] The United States maintains that operation of an illegally-modified source
constitutes an ongoing violation.  This Court agreed, and found that NSR
violations recur on each day of operation.  *Nat'l Parks Conservation Ass'n, Inc. v.
Tenn. Valley Auth.*, 480 F.3d 410 (6th Cir. 2007).

2d 591, 593 (M.D. La. 2012); *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 829 (E.D. Tenn. 2009); *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 865, 881 (S.D. Ohio 2003); *United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692 C-M/F, 2002 WL 1629817, at *2-3 & n.3 (S.D. Ind. July 18, 2002).  Allowing post-project data to trump preconstruction expectations would violate the Clean Air Act because it would "'allow sources to construct without a permit while they wait to see if it would be proven that emissions would increase. *Clearly, Congress did not intend such an outcome, which would eviscerate the preconstruction dimension of the program*.'"  *Southern Indiana Gas & Electric*, 2002 WL 1629817, at *2-3 & n.3 (emphasis added) (quoting *In re: Tenn. Valley Auth.*, No. CAA-2000-04-008, 2000 WL 1358648 (EAB Sept. 15, 2000), *rev'd on other grounds, Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236 (11th Cir. 2003)).

EPA's rules confirm the point.  The rules state that any source that "commences construction" of a "modification" without a permit will be subject to enforcement.  40 C.F.R. § 52.21(r)(1).  The language of § 52.21(r)(1) reiterates that a project's status as a major modification must be determined initially at the time of construction, and that EPA can enforce that determination.

Before it was sued, DTE understood the program to work just as the United States has explained.  An industry trade group that includes DTE defended the

2002 NSR rules before the D.C. Circuit and explained that sources were at risk for enforcement based on preconstruction analysis: "If the source's [pre-construction] determination ultimately turns out to be incorrect *in the view of EPA or a state agency*, the source may be subject to enforcement for violating NSR."  Joint Brief of Industry Intervenors*, New York v. EPA*, No. 02-1387, 2004 WL 5846442, at *18-*19 (D.C. Cir. Oct. 26, 2004) (emphasis added).  As DTE recognized then, enforcement is not limited to situations where there is a *post hoc* emissions increase – EPA can bring an action where the source fails to properly perform the preconstruction analysis.

2.  *Preconstruction NSR applicability turns on what the source should have expected before construction*

To determine its preconstruction permitting obligations, an operator must perform an "accurate projection" that complies with the NSR rules.  *DTE Energy*, 711 F.3d at 649.  Where the operator fails to do so, EPA or citizens may bring an enforcement action to obtain the necessary projection.

Because a violation of the major modification requirements occurs as the source performs the work, a projection is needed to establish whether the source should have complied with NSR.  The burden on the plaintiff in such an enforcement action is "to show that at the time of the projects [defendant] expected, or should have expected, that its modifications would result in [emissions increases]."  *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282

(11th Cir. 2013).  The Seventh Circuit described the question in NSR enforcement actions this way:  whether the work "*would* result in an increase in annual emissions . . . ('Would,' not 'did,' because the permit must be obtained before the modification is made, and so the effect on emissions is a prediction rather than an observation.)."  *United States v. Cinergy Corp.*, 623 F.3d 455, 459 (7th Cir. 2010); *see also Duke Energy*, 5 F. Supp. 3d at 782 n.6; *Louisiana Generating,* 929 F. Supp. 2d at 593; *National Parks*, 618 F. Supp. 2d at 829; *Southern Indiana Gas & Electric*, 2002 WL 1629817, at *2-3 & n.3; *Ohio Edison*, 276 F. Supp. 2d at 865, 881.

The task for the district court then is not to "create or choose a formula to apply" for a retrospective projection but to "determine whether [the operator] reasonably should have projected a significant increase in emissions using whatever methodology would serve that purpose. Such a determination of reasonableness is well within the jurisdiction of the Court."  *United States v. Duke Energy Corp.*, No. 1:00CV1262, 2010 WL 3023517, *6 (M.D.N.C. July 28, 2010) (citing *United States v. Cinergy Corp.,* 458 F.3d 705, 707-08 (7th Cir. 2006)).

**B. <u>Once A Source Violates NSR, It Must Comply With The
Substantive Requirements Of The Statute And Regulations</u>**

Where an operator should have predicted an emissions increase before
construction, the project qualifies as a major modification. That means that the
source must comply with the statutory and regulatory NSR preconstruction
requirements, including permits and pollution controls. Where an operator fails to
get the necessary NSR permit before construction, it can be ordered to perform "a
further round of modifications to get the permit and [may have to] pay hefty
penalties for the delay." *Midwest Generation*, 720 F.3d at 646. An operator's
unlawful emissions projection, and the resulting failure to get a permit, cannot be
cured by post-project data. DTE also maintains that any failure in its
preconstruction analysis was merely a paperwork violation subject to a penalty but
not substantive NSR requirements like pollution controls. Both arguments lack
merit and are inconsistent with the clear statutory command that a major
modification must comply with NSR requirements before construction.

> 1. *<u>A project that is a major modification based on
> preconstruction analysis cannot escape the modification
> requirements based on post-project events</u>*

As this Court recognized in its prior decision, assessing applicability before
construction must be done based on projections. *DTE Energy*, 711 F.3d 649-50.
Those projections determine whether a project is a major modification. Nothing in

the statute or regulations suggests that once construction is complete, a project that should have triggered preconstruction requirements may be excused from NSR.

By holding that the United States cannot prove a major modification at Monroe 2, the district court creates the illogical situation where EPA could have prevented DTE from performing the Monroe 2 overhaul without NSR permits, *see* 42 U.S.C. § 7477, but cannot get relief after the fact until pollution increases. Under the district court's approach, the project would be a modification when it began, but not when it concluded. This result cannot be squared with the statutory requirement that modification status first be determined by the beginning of construction or the case law holding that a violation of the major modification requirements occurs at construction.

DTE's related argument that any deficiency in preconstruction analysis is essentially a paperwork violation fares no better. DTE argues that failure to abide by the rules for the NSR preconstruction analysis "would justify, at most, a one-time civil penalty." SJ Reply, RE 183, Page ID 7167. Again, this ignores the fact that preconstruction analysis is necessary to determine whether the project was a modification. Where an operator fails to follow the regulations, and EPA can demonstrate that a proper analysis would have resulted in the conclusion that the project was a major modification, the modification requirements have been triggered and must be met. *See* Section II.A.2.

In short, the district court's alternative holding and DTE's penalty-only argument are simply new ways of saying that only post-project data can trigger major modification status. This Court already rejected that argument, as has every other court to consider it. *See* Section II.A.1.

### 2. *In a preconstruction program, post-project data does not trump preconstruction analyses*

The district court's reasoning may have been driven by a perception that post-project data is more probative than projections. As an initial matter, because a project's modification status must first be determined before construction, using reasonable preconstruction expectations as a compliance measure only makes sense.

Moreover, actual data can fall short as the primary applicability metric because it often varies from year to year. For power plants, weather and general economic conditions play a significant role in generating levels. Thus a cool summer or warm winter could result in decreased emissions for a year or two, followed by a year or more of increased pollution. Here, emissions decreased after the project for unforeseen, temporary reasons. *See* p. 15. A project that should have gone through NSR permitting based on preconstruction analysis cannot escape or delay its status as a major modification based on the happenstance of a temporary decrease in post-project emissions. Using preconstruction projections eliminates these problems.

Nor is using projections foreign to sources like DTE.  In deciding whether to renovate or expand a facility, a business like DTE must weigh the costs of doing so against the projected benefits, factoring in anticipated business conditions.  The *prediction* of future benefits determines whether a project will proceed or not; the cost of a bad business prediction will be missed opportunities for revenue or an expanded facility sitting unused.  For NSR, the cost of a bad prediction is borne by the public, so EPA must be able to review to ensure that the source has followed the rules in assessing its applicability.

Notably the difference between the parties on appeal is not about which of two competing projections is "better," nor is it one that post-project data can resolve.  Even DTE projected that emissions would increase – it merely excluded the entire increase as based solely on demand growth.  The difference between the parties is simply whether DTE followed the rules in excluding the emissions that it did.  DTE excluded emissions that were related to the project under the company's own analysis.  That mistake in applying the rules occurred *before* construction.  The fact the actual emissions did not increase for reasons that DTE did not anticipate does nothing to show that DTE was correct in claiming its projected increase was unrelated to the project.

### 3. *NSR requires enforceable preconstruction applicability to work as designed*

A program that imposes liability solely *after* the project would be inconsistent with the timing mandated by Congress.  Liability must be enforceable preconstruction to ensure that – as a general rule – "pollution control measures are undertaken when they can be most effective, at the time of new or modified construction."  *National-Southwire Aluminum Co. v. U.S. E.P.A.,* 838 F.2d 835, 843 (6th Cir. 1988) (Boggs, J., dissenting) (internal citations omitted); *see also Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990).  Installing controls at the time of the project is both efficient for the source and compelled by the statute.  By contrast, DTE's wait-and-see version of NSR would create a powerful incentive for sources to evade modification requirements before construction.  If operators that should have obtained permits before construction can avoid those requirements even when caught years after the fact, the preconstruction requirements will become the exception rather than the rule.  *See United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1141, 1166 (D. Colo. 1988) (without potential enforcement "future sources that are unsure of whether they will qualify as a major source will have no incentive to apply for PSD permits").

That wait-and-see approach to NSR applicability would have impacts on air quality and economic growth.  When an operator like DTE delays NSR compliance, the failure to install statutory pollution controls at the time of the work

can mean the emission of thousands of tons of pollution that would not otherwise occur. *See DTE Energy*, 711 F.3d at 647 (noting that compliance yields "enormous emissions reductions."). In such a situation, the failure to comply harms the public health. It could also constrain economic growth by making it harder for sources that come later to get permits. For example, sources seeking Prevention of Significant Deterioration permits must demonstrate that their emissions will not cause or contribute to violations of air quality standards or of pollution "increments" established to protect air quality. 42 U.S.C. § 7475(a)(3). The sources must account for other emissions in the area. 40 C.F.R. § 52.21(k). DTE's failure to comply before construction makes it that much harder for future sources to construct or modify.

DTE's actions here illustrate the stakes. Four years after performing the $65 million overhaul at Monroe 2, DTE has now installed controls at the unit. The company simply installed the necessary controls when it was planning to do so anyway. *See* DTE Opposition to Preliminary Injunction, RE 46, Page ID 1152. By failing to comply with NSR at the time of the project, the company delayed operation of those pollution controls by four years. That delay saved DTE money, but at a huge cost to public health and economic growth. As one United States' expert explained, each year Monroe 2 went uncontrolled resulted in approximately 90 premature deaths and total social costs of $500 million. Declaration of Joel

Schwartz, RE 8-23, Page ID 507.  Meanwhile, sources that played by the rules

could have been constrained in how they could expand because Monroe 2's

emissions made new permits harder to obtain.

### III.    THIS COURT SHOULD DEFER TO EPA'S INTERPRETATION OF THE NSR PROGRAM'S REQUIREMENTS

If there was any doubt as to how the statute and regulations should work,

this Court should accord EPA's interpretation deference.  Two levels of deference

are at play here:

> As a general matter, deference should be given to an agency's
> interpretation of a regulation when the agency has been given
> responsibility to issue regulations under the statute in question, to
> explain the responsibilities of those concerned under the statute, and
> to enforce the statute in court. . . . When an agency is interpreting its
> own regulations, even greater deference is due to the agency's
> interpretation.

*United States v. Cinemark USA, Inc.*, 348 F.3d 569, 578 (6th Cir. 2003).

Courts have long recognized that deference is particularly appropriate for

EPA's NSR rules.  As both this Court and the Supreme Court have noted,

Congress "'lodge[d] in the Agency encompassing supervisory responsibility over

the construction and modification of pollutant emitting facilities in areas covered

by the PSD program.'"  *DTE Energy*, 711 F.3d at 650 (quoting *Alaska Dep't of

Envtl. Conservation v. EPA*, 540 U.S. 461, 484 (2004)).  The complexity of the

resulting program provides an additional reason for courts to defer: "The principle

of deference has particular force where, as is the case here, the subject being

regulated is technical and complex." *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 907 (7th Cir. 1990).

EPA has spoken definitively on the issues raised in this appeal. EPA's rules themselves specifically state that the agency will enforce when operators fail to appropriately assess preconstruction liability. The rules state that any source that "commences construction" of a "modification" without a permit will be subject to enforcement. 40 C.F.R. § 52.21(r)(1). By linking modification with the commencement of construction, that provision both makes clear that a modification occurs at construction *and* that EPA will enforce where operators fail to properly assess their liability. EPA confirmed the point in promulgating the 2002 NSR rules: "If you are subsequently determined not to have . . . properly project[ed] emissions . . . you will be subject to any applicable enforcement provisions." 67 Fed Reg. 80,186, 80,190 (Dec. 31, 2002); *see also* 2012 Appellate Reply Brief (Case No. 11-2328) at 12-13 (citing examples from EPA Technical Support Document in support of 2002 rules, RE 114-6, Page ID 4826-4890). The appellate courts have reached the same conclusion. *See* Section II.A.2.

Beyond the clear statement in the regulations and supporting materials, EPA has gone even further and explained how preconstruction violations could be proved in a detailed decision by the Environmental Appeals Board in 2000. The Board was created by the EPA Administrator to hear appeals of permitting

decisions and is the "final decisionmaker in EPA adjudications." 57 Fed. Reg.

5320 (Feb. 13, 1992). Then-Administrator Carol Browner asked the Board to

consider TVA's appeal of an administrative compliance order that presented the

same issues of NSR enforcement that arise here. The Board heard and rejected the

argument that post-project data determines whether a source must obtain a PSD

permit. The Board explained:

> Because the statute and regulations contemplate that the regulated
> entity must predict future events in order to determine whether a
> permit is required, we conclude that it is appropriate to base a finding
> of violation (for failure to obtain the permit) upon what the entity
> reasonably could have predicted prior to beginning "construction."
> Any other construction of the statute would turn the preconstruction
> permitting program on its head and would allow sources to construct
> without a permit while they wait to see if it would be proven that
> emissions would increase. Clearly Congress did not intend such an
> outcome, which would eviscerate the preconstruction dimension of
> the program.

*In re Tenn. Valley Auth.*, 9 E.A.D. 357, 359 (2000) (available at 2000 WL

1358648) (*rev'd on other grounds, Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236

(11th Cir. 2003); *see also Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley

Auth.*, 480 F.3d 410, 414 (6th Cir. 2007) (describing Eleventh Circuit holding

regarding the EAB decision)). The Board went on to explain that whether a

violation occurred should be determined by "evidence regarding projections of

emissions increases that should have been performed by TVA before it made the

physical changes." *Id*.

The EPA statements described above warrant deference under *Chevron* and *Auer* as EPA's interpretation of how NSR enforcement must operate. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 549 (6th Cir. 2004); *see also Talk America, Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2261, 2263 (2011) (deference extends to interpretations advanced in legal briefs); *Alaska Wilderness League v. U.S. E.P.A.*, 727 F.3d 934, 936-37 (9th Cir. 2013) (affording *Chevron* deference to Environmental Appeals Board interpretation of Clean Air Act Title V and PSD provisions).

In the prior appeal and in briefing before the district court, DTE argued that EPA's rules themselves *compel* a wait-and-see approach to NSR liability. This Court already effectively rejected that claim when it concluded that EPA has the ability to bring enforcement actions based on an operator's preconstruction analysis. 711 F.3d at 650. As described in the first appeal, DTE's interpretation of EPA's rules is simply incorrect. Nothing in EPA's rules restricts the agency's ability to enforce NSR based on a proper preconstruction analysis. 2012 Appellate Reply Brief (Case No. 11-2328) at 5-20.

Under the statute, NSR applicability is first determined by the time of construction, and that determination is enforceable by EPA. Where a source would have triggered NSR – and should have obtained permits and installed pollution controls – had it followed the NSR rules before construction, that source is subject

to an order requiring compliance with the major modification requirements.  Even if there was any doubt about the operation of the program, this Court should defer to EPA's interpretation.

## CONCLUSION

This court should reverse the grant of summary judgment and remand for further proceedings.

Respectfully submitted,

*/s/ Thomas A. Benson*
SAM HIRSCH
 Acting Assistant Attorney General

THOMAS A. BENSON
 U.S. Department of Justice
 Environment & Natural Res. Div.
 P.O. Box 7611
 Washington, DC 20044-7611
 (202) 514-5261

December 23, 2014
90-5-2-1-09949

## CERTIFICATE OF COMPLIANCE
## WITH TYPE VOLUME LIMITATION

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,366 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(b)(1). The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because I prepared it in a proportionally spaced typeface using 14-point Times New Roman type.

*/s/ Thomas A. Benson*
THOMAS A. BENSON
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-5261

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing brief upon counsel of record using the Sixth Circuit's electronic case filing system.

In addition, I served a copy of the foregoing brief by email upon counsel in the related appeal, No. 14-2275:

Shannon Fisk
Mary Whittle
Earthjustice
1617 John F. Kennedy Blvd.
Suite 1675
Philadelphia, PA 19103

*/s/ Thomas A. Benson*
THOMAS A. BENSON
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-5261

December 23, 2014

## RELEVANT DISTRICT COURT DOCUMENTS

| | |
|---|---|
| **Dkt. #1**<br>*Page ID 1-17* | **Complaint** |
| **Dkt. #8**<br>*Page ID 8-72* | **United States' Motion for Preliminary Injunction** |
| 8-2<br>*Page ID 75-138* | Ex. 1, Declaration of Lyle Chinkin |
| 8-6<br>*Page ID 163-168* | Ex. 2C, DTE Notice Letter |
| 8-13<br>*Page ID 229-250* | Ex. 3, Declaration of Ranajit Sahu |
| 8-16<br>*Page ID 283-336* | Ex. 5, Declaration of Robert H. Koppe |
| 8-17<br>*Page ID 337-349* | Ex. 6, Declaration of A. Michael Hekking |
| 8-19<br>*Page ID 363-405* | Ex. 8, Declaration of Bruce Biewald |
| 8-23<br>*Page ID 504-566* | Ex. 12, Declaration of Dr. Joel Schwartz |
| **Dkt. #46**<br>*Page ID 1137-1182* | **DTE's Opposition To #8** |
| **Dkt. #58**<br>*Page ID 1825-1844* | **United States' Reply In Support Of #8** |
| 58-11<br>*Page ID 2140-2150* | Ex. 16, Declaration of Bruce Biewald |
| Dkt. #60 | Ex. 13E, DTE Economizer Replacement PowerPoint [UNDER SEAL] |
| Dkt. #61 | Ex. 13F, DTE Reheater Replacement PowerPoint [UNDER SEAL] |
| **Dkt. #78**<br>*Page ID 2495* | **Order Denying Preliminary Injunction** |
| **Dkt. #107**<br>*Page ID 4667-4699* | **DTE's Motion For Summary Judgment** |

| Dkt. #114 | United States' Opposition To #107 |
|---|---|
| *Page ID 4777-4804* | |
| 114-3 | Ex. 4, Fessler Email |
| *Page ID 4809-4811* | |
| 114-5 | Ex. 6, DTE 2005 Letter To Michigan |
| *Page ID 4818-4825* | |
| 114-6 | Ex. 9, Technical Support Document Excerpts |
| *Page ID 4826-4890* | |
| 114-7 | Ex. 12, EPA Northampton Letter |
| *Page ID 4891-4899* | |
| 115-3 | Ex. 7, Rugenstein Deposition Excerpts [UNDER SEAL] |
| 115-4 | Ex. 11, Boyd Deposition Excerpts [UNDER SEAL] |
| **Dkt. #119** | **DTE's Reply In Support Of #107** |
| *Page ID 5639-5670* | |
| **Dkt. #160** | **Order Granting #107** |
| *Page ID 6634-6645* | |
| **Dkt. #166** | **DTE's Second Motion For Summary Judgment** |
| *Page ID 6692-6721* | |
| 166-5 | Ex. 4, Declaration of Skiles Boyd |
| *Page ID 6794-6799* | |
| **Dkt. #167** | **Mandate From Sixth Circuit Decision In 11-2328** |
| *Page ID 6804-6806* | |
| **Dkt. #178** | **United States' Opposition to #166 [UNDER SEAL]** |
| **Dkt. #179** | **Sierra Club's Opposition to #166** |
| *Page ID 7017-7039* | |
| **Dkt. #181** | **United States' Opposition to #166 [Publically Filed]** |
| *Page ID 7041-7043* | |
| 181-3 | Ex. A, DTE Project Authorization Papers [REDACTED] |
| *Page ID 7076-7085* | |
| 181-4 | Ex. C, DTE Responses to Requests for Admission |
| *Page ID 7086-7108* | |

| | |
|---|---|
| 181-7<br>*Page ID 7118-7149* | Ex. G, Expert Report of Philip Hayet [REDACTED] |
| **Dkt. #183**<br>*Page ID 7160-7178* | **DTE's Reply In Support Of #166** |
| **Dkt. #196**<br>*Page ID 7513-7516* | **Order Granting #166** |
| **Dkt. #220**<br>*Page ID 7697-7700* | **Order Entering Partial Final Judgment** |
| **Dkt. #221**<br>*Page ID 7701-7703* | **United States' Notice Of Appeal** |

# STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

1.    Clean Air Act § 111, 42 U.S.C. § 7411 ..................................................................2

2.    Clean Air Act § 113, 42 U.S.C. § 7413 ................................................................2

3.    Clean Air Act § 160, 42 U.S.C. § 7470 ................................................................4

4.    Clean Air Act § 165, 42 U.S.C. § 7475 ................................................................5

5.    Clean Air Act § 167, 42 U.S.C. § 7477 ................................................................6

6.    Clean Air Act § 173, 42 U.S.C. § 7503 ................................................................7

7.    Clean Air Act § 304, 42 U.S.C. § 7604 ................................................................9

8.    40 C.F.R. § 52.21(a)(2) ......................................................................................10

9.    40 C.F.R. § 52.21(b)(2) ......................................................................................12

10.   40 C.F.R. § 52.21(b)(23) ....................................................................................14

11.   40 C.F.R. § 52.21(b)(41) ....................................................................................15

12.   40 C.F.R. § 52.21(b)(48) ....................................................................................16

13.   40 C.F.R. § 52.21(k) ..........................................................................................17

14.   40 C.F.R. § 52.21(r)(1) ......................................................................................18

15.   40 C.F.R. § 52.21(r)(6) ......................................................................................18

**42 U.S.C.A. § 7411(a) Definitions**

For purposes of this section:

(4) The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

_____

**42 U.S.C.A. § 7413. Federal enforcement**

**(a) (3) EPA enforcement of other requirements**

Except for a requirement or prohibition enforceable under the preceding provisions of this subsection, whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition of this subchapter, section 7603 of this title, subchapter IV-A, subchapter V, or subchapter VI of this chapter, including, but not limited to, a requirement or prohibition of any rule, plan, order, waiver, or permit promulgated, issued, or approved under those provisions or subchapters, or for the payment of any fee owed to the United States under this chapter (other than subchapter II of this chapter), the Administrator may--

    (A) issue an administrative penalty order in accordance with subsection (d) of this section,

    (B) issue an order requiring such person to comply with such requirement or prohibition,

    (C) bring a civil action in accordance with subsection (b) of this section or section 7605 of this title, or

    (D) request the Attorney General to commence a criminal action in accordance with subsection (c) of this section.

**(b) Civil judicial enforcement**

The Administrator shall, as appropriate, in the case of any person that is the owner or operator of an affected source, a major emitting facility, or a major stationary

source, and may, in the case of any other person, commence a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day for each violation, or both, in any of the following instances:

(1) Whenever such person has violated, or is in violation of, any requirement or prohibition of an applicable implementation plan or permit. Such an action shall be commenced (A) during any period of federally assumed enforcement, or (B) more than 30 days following the date of the Administrator's notification under subsection (a)(1) of this section that such person has violated, or is in violation of, such requirement or prohibition.

(2) Whenever such person has violated, or is in violation of, any other requirement or prohibition of this subchapter, section 7603 of this title, subchapter IV-A, subchapter V, or subchapter VI of this chapter, including, but not limited to, a requirement or prohibition of any rule, order, waiver or permit promulgated, issued, or approved under this chapter, or for the payment of any fee owed the United States under this chapter (other than subchapter II of this chapter).

(3) Whenever such person attempts to construct or modify a major stationary source in any area with respect to which a finding under subsection (a)(5) of this section has been made.

[…]

**42 USC § 7470. Congressional declaration of purpose**

The purposes of this part are as follows:

(1) to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate to occur from air pollution or from exposures to pollutants in other media, which pollutants originate as emissions to the ambient air), notwithstanding attainment and maintenance of all national ambient air quality standards;

(2) to preserve, protect, and enhance the air quality in national parks, national wilderness areas, national monuments, national seashores, and other areas of special national or regional natural, recreational, scenic, or historic value;

(3) to insure that economic growth will occur in a manner consistent with the preservation of existing clean air resources;

(4) to assure that emissions from any source in any State will not interfere with any portion of the applicable implementation plan to prevent significant deterioration of air quality for any other State; and

(5) to assure that any decision to permit increased air pollution in any area to which this section applies is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process.

**42 USC § 7475. Preconstruction requirements**

(a) Major emitting facilities on which construction is commenced

No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless--

(1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part;

(2) the proposed permit has been subject to a review in accordance with this section, the required analysis has been conducted in accordance with regulations promulgated by the Administrator, and a public hearing has been held with opportunity for interested persons including representatives of the Administrator to appear and submit written or oral presentations on the air quality impact of such source, alternatives thereto, control technology requirements, and other appropriate considerations;

(3) the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title, that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of any (A) maximum allowable increase or maximum allowable concentration for any pollutant in any area to which this part applies more than one time per year, (B) national ambient air quality standard in any air quality control region, or (C) any other applicable emission standard or standard of performance under this chapter;

(4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility;

(5) the provisions of subsection (d) of this section with respect to protection of class I areas have been complied with for such facility;

(6) there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;

(7) the person who owns or operates, or proposes to own or operate, a major emitting facility for which a permit is required under this part agrees to conduct such monitoring as may be necessary to determine the effect which

emissions from any such facility may have, or is having, on air quality in any area which may be affected by emissions from such source; and

(8) in the case of a source which proposes to construct in a class III area, emissions from which would cause or contribute to exceeding the maximum allowable increments applicable in a class II area and where no standard under section 7411 of this title has been promulgated subsequent to August 7, 1977, for such source category, the Administrator has approved the determination of best available technology as set forth in the permit.

_____

## 42 U.S.C.A. § 7477. Enforcement

The Administrator shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area designated pursuant to section 7407(d) of this title as attainment or unclassifiable and which is not subject to an implementation plan which meets the requirements of this part.

**42 U.S.C.A. § 7503 (a) Permit requirements**

(a) In general

The permit program required by section 7502(b)(6) of this title shall provide that permits to construct and operate may be issued if--

(1) in accordance with regulations issued by the Administrator for the determination of baseline emissions in a manner consistent with the assumptions underlying the applicable implementation plan approved under section 7410 of this title and this part, the permitting agency determines that--

(A) by the time the source is to commence operation, sufficient offsetting emissions reductions have been obtained, such that total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the proposed source will be sufficiently less than total emissions from existing sources (as determined in accordance with the regulations under this paragraph) prior to the application for such permit to construct or modify so as to represent (when considered together with the plan provisions required under section 7502 of this title) reasonable further progress (as defined in section 7501 of this title); or

(B) in the case of a new or modified major stationary source which is located in a zone (within the nonattainment area) identified by the Administrator, in consultation with the Secretary of Housing and Urban Development, as a zone to which economic development should be targeted, that emissions of such pollutant resulting from the proposed new or modified major stationary source will not cause or contribute to emissions levels which exceed the allowance permitted for such pollutant for such area from new or modified major stationary sources under section 7502(c) of this title;

(2) the proposed source is required to comply with the lowest achievable emission rate;

(3) the owner or operator of the proposed new or modified source has demonstrated that all major stationary sources owned or operated by such person (or by any entity controlling, controlled by, or under common control with such person) in such State are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission

limitations and standards under this chapter; and

(4) the Administrator has not determined that the applicable implementation plan is not being adequately implemented for the nonattainment area in which the proposed source is to be constructed or modified in accordance with the requirements of this part; and

(5) an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed source demonstrates that benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

Any emission reductions required as a precondition of the issuance of a permit under paragraph (1) shall be federally enforceable before such permit may be issued.

_____

## 42 U.S.C.A. § 7503 (c) Permit requirements

(c) Offsets

(1) The owner or operator of a new or modified major stationary source may comply with any offset requirement in effect under this part for increased emissions of any air pollutant only by obtaining emission reductions of such air pollutant from the same source or other sources in the same nonattainment area, except that the State may allow the owner or operator of a source to obtain such emission reductions in another nonattainment area if (A) the other area has an equal or higher nonattainment classification than the area in which the source is located and (B) emissions from such other area contribute to a violation of the national ambient air quality standard in the nonattainment area in which the source is located. Such emission reductions shall be, by the time a new or modified source commences operation, in effect and enforceable and shall assure that the total tonnage of increased emissions of the air pollutant from the new or modified source shall be offset by an equal or greater reduction, as applicable, in the actual emissions of such air pollutant from the same or other sources in the area.

(2) Emission reductions otherwise required by this chapter shall not be creditable as emissions reductions for purposes of any such offset requirement. Incidental emission reductions which are not otherwise required by this chapter shall be creditable as emission reductions for such purposes if such emission reductions meet the requirements of paragraph (1).

**42 U.S.C.A. § 7604. Citizen suits**

(a) Authority to bring civil action; jurisdiction

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf--

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

**40 C.F.R. § 52.21 Prevention of significant deterioration of air quality.**

**(a)(2) Applicability procedures.**

(i) The requirements of this section apply to the construction of any new major stationary source (as defined in paragraph (b)(1) of this section) or any project at an existing major stationary source in an area designated as attainment or unclassifiable under sections 107(d)(1)(A)(ii) or (iii) of the Act.

(ii) The requirements of paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source, except as this section otherwise provides.

(iii) No new major stationary source or major modification to which the requirements of paragraphs (j) through (r)(5) of this section apply shall begin actual construction without a permit that states that the major stationary source or major modification will meet those requirements. The Administrator has authority to issue any such permit.

(iv) The requirements of the program will be applied in accordance with the principles set out in paragraphs (a)(2)(iv)(a) through (f) of this section.

(a) Except as otherwise provided in paragraphs (a)(2)(v) and (vi) of this section, and consistent with the definition of major modification contained in paragraph (b)(2) of this section, a project is a major modification for a regulated NSR pollutant if it causes two types of emissions increases—a significant emissions increase (as defined in paragraph (b)(40) of this section), and a significant net emissions increase (as defined in paragraphs (b)(3) and (b)(23) of this section). The project is not a major modification if it does not cause a significant emissions increase. If the project causes a significant emissions increase, then the project is a major modification only if it also results in a significant net emissions increase.

(b) The procedure for calculating (before beginning actual construction) whether a significant emissions increase (i.e., the first step of the process) will occur depends upon the type of emissions units being modified, according to paragraphs (a)(2)(iv)(c) through (f) of this section. The procedure for calculating (before beginning actual construction) whether a significant net emissions increase will occur at the major stationary source (i.e., the second step of the process) is contained in the definition in paragraph (b)(3) of this section. Regardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and

a significant net emissions increase.

(c) Actual-to-projected-actual applicability test for projects that only involve existing emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the projected actual emissions (as defined in paragraph (b)(41) of this section) and the baseline actual emissions (as defined in paragraphs (b)(48)(i) and (ii) of this section), for each existing emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(d) Actual-to-potential test for projects that only involve construction of a new emissions unit(s). A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference between the potential to emit (as defined in paragraph (b)(4) of this section) from each new emissions unit following completion of the project and the baseline actual emissions (as defined in paragraph (b)(48)(iii) of this section) of these units before the project equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(e) [Reserved]

(f) Hybrid test for projects that involve multiple types of emissions units. A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in paragraphs (a)(2)(iv)(c) through (d) of this section as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(v) For any major stationary source for a PAL for a regulated NSR pollutant, the major stationary source shall comply with the requirements under paragraph (aa) of this section.

(vi) [Reserved]

**\*\*\*\*\***

**(b) Definitions**. For the purposes of this section:

*****

(2)(i) Major modification means any physical change in or change in the method of operation of a major stationary source that would result in: a significant emissions increase (as defined in paragraph (b)(40) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(50) of this section); and a significant net emissions increase of that pollutant from the major stationary source.

(ii) Any significant emissions increase (as defined at paragraph (b)(40) of this section) from any emissions units or net emissions increase (as defined in paragraph (b)(3) of this section) at a major stationary source that is significant for volatile organic compounds or $NO_X$ shall be considered significant for ozone.

(iii) A physical change or change in the method of operation shall not include:

(a) Routine maintenance, repair and replacement. Routine maintenance, repair and replacement shall include, but not be limited to, any activity(s) that meets the requirements of the equipment replacement provisions contained in paragraph (cc) of this section;

Note to paragraph (b)(2)(iii)(a): By court order on December 24, 2003, the second sentence of this paragraph (b)(2)(iii)(a) is stayed indefinitely. The stayed provisions will become effective immediately if the court terminates the stay. At that time, EPA will publish a document in the Federal Register advising the public of the termination of the stay.

(b) Use of an alternative fuel or raw material by reason of an order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (or any superseding legislation) or by reason of a natural gas curtailment plant pursuant to the Federal Power Act;

(c) Use of an alternative fuel by reason of an order or rule under section 125 of the Act;

(d) Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste;

(e) Use of an alternative fuel or raw material by a stationary source which:

(1) The source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any federally enforceable

Addendum 12

permit condition which was established after January 6, 1975 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or 40 CFR 51.166; or

(2) The source is approved to use under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166;

(f) An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR subpart I or 40 CFR 51.166.

(g) Any change in ownership at a stationary source.

(h) [Reserved]

(i) The installation, operation, cessation, or removal of a temporary clean coal technology demonstration project, provided that the project complies with:

(1) The State implementation plan for the State in which the project is located, and

(2) Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

(j) The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant-by-pollutant basis.

(k) The reactivation of a very clean coal-fired electric utility steam generating unit.

(iv) This definition shall not apply with respect to a particular regulated NSR pollutant when the major stationary source is complying with the requirements under paragraph (aa) of this section for a PAL for that pollutant. Instead, the definition at paragraph (aa)(2)(viii) of this section shall apply.

(v) Fugitive emissions shall not be included in determining for any of the purposes of this section whether a physical change in or change in the method of operation of a major stationary source is a major modification, unless the source belongs to one of the source categories listed in paragraph (b)(1)(iii) of this

section.

**\*\*\*\*\***

(23)(i) Significant means, in reference to a net emissions increase or the potential of a source to emit any of the following pollutants, a rate of emissions that would equal or exceed any of the following rates:

Pollutant and Emissions Rate

Carbon monoxide: 100 tons per year (tpy)

Nitrogen oxides: 40 tpy

Sulfur dioxide: 40 tpy

Particulate matter: 25 tpy of particulate matter emissions

$PM_{10}$: 15 tpy

$PM_{2.5}$: 10 tpy of direct $PM_{2.5}$ emissions; 40 tpy of sulfur dioxide emissions; 40 tpy of nitrogen oxide emissions unless demonstrated not to be a $PM_{2.5}$ precursor under paragraph (b)(50) of this section

Ozone: 40 tpy of volatile organic compounds or nitrogen oxides

Lead: 0.6 tpy

Fluorides: 3 tpy

Sulfuric acid mist: 7 tpy

Hydrogen sulfide ($H_2S$): 10 tpy

Total reduced sulfur (including $H_2S$): 10 tpy

Reduced sulfur compounds (including $H_2S$): 10 tpy

Municipal waste combustor organics (measured as total tetra-through octa-chlorinated dibenzo-p-dioxins and dibenzofurans): 3.2 x $10^{-6}$ megagrams per year (3.5 x $10^{-6}$ tons per year)

Municipal waste combustor metals (measured as particulate matter): 14 megagrams

Addendum 14

per year (15 tons per year)

Municipal waste combustor acid gases (measured as sulfur dioxide and hydrogen chloride): 36 megagrams per year (40 tons per year)

Municipal solid waste landfills emissions (measured as nonmethane organic compounds): 45 megagrams per year (50 tons per year)

**\*\*\*\*\***

(41)(i) Projected actual emissions means the maximum annual rate, in tons per year, at which an existing emissions unit is projected to emit a regulated NSR pollutant in any one of the 5 years (12–month period) following the date the unit resumes regular operation after the project, or in any one of the 10 years following that date, if the project involves increasing the emissions unit's design capacity or its potential to emit that regulated NSR pollutant and full utilization of the unit would result in a significant emissions increase or a significant net emissions increase at the major stationary source.

(ii) In determining the projected actual emissions under paragraph (b)(41)(i) of this section (before beginning actual construction), the owner or operator of the major stationary source:

(a) Shall consider all relevant information, including but not limited to, historical operational data, the company's own representations, the company's expected business activity and the company's highest projections of business activity, the company's filings with the State or Federal regulatory authorities, and compliance plans under the approved State Implementation Plan; and

(b) Shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions; and

(c) Shall exclude, in calculating any increase in emissions that results from he particular project, that portion of the unit's emissions following the project that an existing unit could have accommodated during the consecutive 24–month period used to establish the baseline actual emissions under paragraph (b)(48) of this section and that are also unrelated to the particular project, including any increased utilization due to product demand growth; or

(d) In lieu of using the method set out in paragraphs (a)(41)(ii)(a) through (c) of this section, may elect to use the emissions unit's potential to emit, in tons per year, as defined under paragraph (b)(4) of this section.

**\*\*\*\*\***

(48) Baseline actual emissions means the rate of emissions, in tons per year, of a regulated NSR pollutant, as determined in accordance with paragraphs (b)(48)(i) through (iv) of this section.

(i) For any existing electric utility steam generating unit, baseline actual emissions means the average rate, in tons per year, at which the unit actually emitted the pollutant during any consecutive 24–month period selected by the owner or operator within the 5–year period immediately preceding when the owner or operator begins actual construction of the project. The Administrator shall allow the use of a different time period upon a determination that it is more representative of normal source operation.

(a) The average rate shall include fugitive emissions to the extent quantifiable, and emissions associated with startups, shutdowns, and malfunctions.

(b) The average rate shall be adjusted downward to exclude any non-compliant emissions that occurred while the source was operating above any emission limitation that was legally enforceable during the consecutive 24–month period.

(c) For a regulated NSR pollutant, when a project involves multiple emissions units, only one consecutive 24–month period must be used to determine the baseline actual emissions for the emissions units being changed. A different consecutive 24–month period can be used For each regulated NSR pollutant.

(d) The average rate shall not be based on any consecutive 24–month period for which there is inadequate information for determining annual emissions, in tons per year, and for adjusting this amount if required by paragraph (b)(48)(i)(b) of this section.

**\*\*\*\*\***

Addendum 16

**(k) Source impact analysis—**

(1) Required demonstration. The plan shall provide that the owner or operator of the proposed source or modification shall demonstrate that allowable emission increases from the proposed source or modification, in conjunction with all other applicable emissions increases or reduction (including secondary emissions), would not cause or contribute to air pollution in violation of:

(i) Any national ambient air quality standard in any air quality control region; or

(ii) Any applicable maximum allowable increase over the baseline concentration in any area.

(2) [Reserved by 78 FR 73702]

**\*\*\*\*\***

**(r) Source obligation.**

(1) Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction after the effective date of these regulations without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

**\*\*\*\*\***

(6) Except as otherwise provided in paragraph (r)(6)(vi)(b) of this section, the provisions of this paragraph (r)(6) apply with respect to any regulated NSR pollutant emitted from projects at existing emissions units at a major stationary source (other than projects at a source with a PAL) in circumstances where there is a reasonable possibility, within the meaning of paragraph (r)(6)(vi) of this section, that a project that is not a part of a major modification may result in a significant emissions increase of such pollutant, and the owner or operator elects to use the method specified in paragraphs (b)(41)(ii)(a) through (c) of this section for calculating projected actual emissions.

(i) Before beginning actual construction of the project, the owner or operator shall document and maintain a record of the following information:

(a) A description of the project;

(b) Identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project; and

(c) A description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant, including the baseline actual emissions, the projected actual emissions, the amount of emissions excluded under paragraph (b)(41)(ii)(c) of this section and an explanation for why such amount was excluded, and any netting calculations, if applicable.

(ii) If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the

information set out in paragraph (r)(6)(i) of this section to the Administrator. Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the Administrator before beginning actual construction.

(iii) The owner or operator shall monitor the emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by any emissions unit identified in paragraph (r)(6)(i)(b) of this section; and calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5 years following resumption of regular operations after the change, or for a period of 10 years following resumption of regular operations after the change if the project increases the design capacity or potential to emit that regulated NSR pollutant at such emissions unit.

(iv) If the unit is an existing electric utility steam generating unit, the owner or operator shall submit a report to the Administrator within 60 days after the end of each year during which records must be generated under paragraph (r)(6)(iii) of this section setting out the unit's annual emissions during the calendar year that preceded submission of the report.

(v) If the unit is an existing unit other than an electric utility steam generating unit, the owner or operator shall submit a report to the Administrator if the annual emissions, in tons per year, from the project identified in paragraph (r)(6)(i) of this section, exceed the baseline actual emissions (as documented and maintained pursuant to paragraph (r)(6)(i)(c) of this section), by a significant amount (as defined in paragraph (b)(23) of this section) for that regulated NSR pollutant, and if such emissions differ from the preconstruction projection as documented and maintained pursuant to paragraph (r)(6)(i)(c) of this section. Such report shall be submitted to the Administrator within 60 days after the end of such year. The report shall contain the following:

   (a) The name, address and telephone number of the major stationary source;

   (b) The annual emissions as calculated pursuant to paragraph (r)(6)(iii) of this section; and

   (c) Any other information that the owner or operator wishes to include in the report (e.g., an explanation as to why the emissions differ from the preconstruction projection).

(vi) A "reasonable possibility" under paragraph (r)(6) of this section occurs when the owner or operator calculates the project to result in either:

Addendum 19

(a) A projected actual emissions increase of at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant; or

(b) A projected actual emissions increase that, added to the amount of emissions excluded under paragraph (b)(41)(ii)(c) of this section, sums to at least 50 percent of the amount that is a "significant emissions increase," as defined under paragraph (b)(40) of this section (without reference to the amount that is a significant net emissions increase), for the regulated NSR pollutant. For a project for which a reasonable possibility occurs only within the meaning of paragraph (r)(6)(vi)(b) of this section, and not also within the meaning of paragraph (r)(6)(vi)(a) of this section, then provisions (r)(6)(ii) through (v) do not apply to the project.