# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

No. 14-2274

---

## UNITED STATES,

*Plaintiff-Appellant*,

*v.*

## DTE ENERGY CO. AND DETROIT EDISON CO.

*Defendant-Appellees*.

---

On Appeal From The U.S. District Court
For The Eastern District Of Michigan, No. 10-13101
(Hon. Bernard A. Friedman).

---

## REPLY BRIEF FOR PLAINTIFF-APPELLANT UNITED STATES

JOHN C. CRUDEN
Assistant Attorney General

JASON A. DUNN
KRISTIN M. FURRIE
*Of Counsel:*                    ELIAS L. QUINN
MELINA WILLIAMS          KATHERINE J. BARTON
SABRINA ARGENTIERI    THOMAS A. BENSON
  U.S. Environmental            U.S. Department of Justice
  Protection Agency              Environment & Nat. Res. Div.
  Washington, DC  20640      Washington, DC  20044-7611
                                        (202) 514-5261

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. ii

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ..................................................................................... 1

I.    POST-PROJECT EMISSIONS DATA ARE NOT THE SOLE DETERMINANT OF
      MAJOR MODIFICATIONS – EPA CAN ENFORCE WHEN A SOURCE REASONABLY
      SHOULD HAVE OBTAINED A PERMIT BEFORE CONSTRUCTION ........................ 3

      A. Contrary To DTE's Assertion, This Court Did Not Find That Only Post-
         Project Data Could Show A Project Is A Major Modification ................ 3

      B. The Clean Air Act Establishes That NSR Applicability Must Be
         Determined Before Construction And That EPA Can Enforce Where A
         Source Should Have Expected Emissions To Increase ........................... 4

      C. The Regulations Do Not Support DTE's Arguments; Instead They
         Confirm That EPA Intended Continued Enforcement Based On
         Preconstruction Analyses ..................................................... 8

            1. DTE's regulatory argument relies on an incorrect reading
               of three sentences from the 2002 Rules ............................... 8

            2. EPA confirmed in finalizing the 2002 Rules that it intended
               substantive review of source projections ............................ 12

      D. Deference Is Due To EPA As The Agency That Wrote The Rules And
         Has Been Charged With Supervising The New Source Review
         Program ................................................................... 13

II.   EPA ENFORCEMENT IS APPROPRIATE HERE BECAUSE DTE FAILED TO
      COMPLY WITH THE REGULATIONS ..................................................16

      A. The Court Held That EPA Could Enforce The Regulations, Specifically
         Including Substantive Provisions Like The Demand Growth
         Exclusion ..........................................................................16

            1.   Contrary to DTE's argument, nothing in the Court's prior
                 opinion limits EPA to enforcing just a subset of the NSR
                 regulations .......................................................16

            2.   In an analogous NSR decision, the Supreme Court
                 confirmed that EPA can review to ensure determinations
                 are reasonable; such review is not 'second-guessing' ...21

      B. DTE Failed To Comply With The Regulations Here, Making EPA
         Enforcement Appropriate .......................................................23

      C. Limiting Enforcement To Only The Most Basic Regulatory
         Requirements Would Result In A Voluntary NSR Program For Existing
         Sources .............................................................................27

III.  EPA HAS PROPERLY ALLEGED THE MONROE UNIT 2 OVERHAUL WAS A
      MAJOR MODIFICATION; THE APPROPRIATE REMEDY IS FOR DTE TO OBTAIN
      PERMITS AND INSTALL POLLUTION CONTROLS ...........................29

CONCLUSION ...........................................................................30

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME
LIMITATION.. ..........................................................................31

CERTIFICATE OF SERVICE ........................................................32

# TABLE OF AUTHORITIES

## CASES:

*Alaska Dep't of Envtl. Conservation v. EPA,*
    540 U.S. 461 (2004) ............................................................ 15, 17, 21, 22, 23, 25

*Frederick v. Shinseki,*
    684 F.3d 1263 (Fed. Cir. 2012) .................................................................. 9

*Landreth Timber Co. v. Landreth,*
    471 U.S. 681 (1985) ................................................................................... 7

*Progressive Corp. & Subsidiaries v. United States,*
    970 F.2d 188 (6th Cir. 1992) .................................................................. 11

*New York v. EPA,*
    413 F.3d 3 (D.C. Cir. 2005) ............................................................ 8, 11, 26, 27

*Sasser v. Adm'r, U.S. E.P.A.,*
    990 F.2d 127 (4th Cir. 1993) .................................................................. 19

*SEC v. Chenery,*
    332 U.S. 194 (1947) ................................................................................ 18

*Tenn. Valley Auth. v. Whitman,*
    336 F.3d 1236 (11th Cir. 2003) ............................................................. 15

*Texas v. E.P.A.,*
    726 F.3d 180 (D.C. Cir. 2013) .................................................... 5, 6, 11

*United States v. Ala. Power Co.,*
    730 F.3d 1278 (11th Cir. 2013) .................................................... 5, 21, 23

*United States v. Ameren Mo.,*
    2012 WL 262655 (E.D. Mo. Jan. 27, 2012) .......................................... 6

*United States v. Cinemark,*
    348 F.3d 569 (6th Cir. 2003) ................................................................. 18

*United States v. Cinergy Corp.,*
    458 F.3d 705 (7th Cir. 2006) ................................................................. 10

*United States v. DTE Energy Co.*,
 711 F.3d 643 (6th Cir. 2013) ....................................................... passim

*United States v. Larionoff*,
 431 U.S. 864 (1977) ........................................................................ 11

*United States v. La.-Pac. Corp.*,
 682 F. Supp. 1141 (D. Colo. 1988)....................................................14

*United States v. Ohio Edison Co.*,
 276 F. Supp. 2d 829 (S.D. Ohio 2003) ................................... 10, 14, 15

*United States v. Okla. Gas & Elec.*,
 2015 WL 224911 (W.D. Okla. Jan. 15, 2015)...................................... 6

*United States v. Xcel Energy, Inc.*,
 759 F. Supp. 2d. 1106 (D. Minn. 2010)................................................7

*Util. Air Regulatory Group v. EPA*,
 134 S. Ct. 2427 (2014)........................................................................5

*Wis. Elec. Power Co. v. Reilly*,
 893 F.2d 901 (7th Cir. 1990) .............................................................28

## **<u>STATUTES:</u>**

1 U.S.C. §1 ...........................................................................................8, 9

42 U.S.C. §§ 7411(a)(4)...........................................................................7

42 U.S.C. §7477 ......................................................................................4

42 U.S.C. §7479(2)(C)............................................................................ 7

42 U.S.C. §7607(d) ............................................................................... 11

## RULES AND REGULATIONS:

40 C.F.R. § 52.21(a)(2)(iv) ........................................................... 9, 10, 11

40 C.F.R. § 52.21(a)(2)(iv)(a) ................................................... 8, 9, 10, 12

40 C.F.R. § 52.21(a)(2)(iv)(b) ................................................... 8, 9, 10, 12

40 C.F.R. § 52.21(a)(2)(iv)(c) ........................................................... 10

40 C.F.R. § 52.21(b)(2)(i) ................................................................10

40 C.F.R. § 52.21(b)(3)(i)(a) .......................................................... 10

40 C.F.R. § 52.21(b)(41)(ii)(*c*) .......................................................... 26


45 Fed. Reg. 52,676 ......................................................................19

67 Fed. Reg. 80,186 ................................................... 10, 11, 12, 14, 29

68 Fed. Reg. 61,248 ......................................................................13

# INTRODUCTION

This Court previously held that EPA could bring an enforcement action to "ensure" that a source's preconstruction projection "is made pursuant to the requirements of the [New Source Review] regulations." *United States v. DTE Energy Co.*, 711 F.3d 643, 652 (6th Cir. 2013). The United States has brought such an action here. Our opening brief explained that DTE failed to comply with the regulations before performing the 2010 Monroe 2 overhaul. The company relied on computer modeling it characterized as its "best estimate" of future operations. While the company's modeling showed a huge pollution increase related to the Monroe 2 work, DTE nonetheless excluded that increase based on a "belief" that the project could not affect emissions. U.S. Opening Brief ("U.S. Br.") at 32-33. That belief is untenable as a matter of law. *Id*. at 34-35. By following that unsupported belief, DTE violated the regulatory requirements that it develop a projection based on all relevant information, and that it exclude from its projected increase only emissions unrelated to the project. *Id*. at 39. Both of those requirements are explicitly noted in the Court's prior opinion as part of the regulations sources must follow. 711 F.3d at 650.

DTE does not – and cannot – dispute that its own modeling shows the company's projected increase was related to the Monroe 2 overhaul. Instead, DTE offers two arguments that would make its preconstruction analysis

effectively unreviewable. First, it asserts that only post-project data can prove a major modification. Second, DTE argues that if EPA can enforce at all, it can only enforce the most elementary requirements of the rules, such as whether the source used the correct significance threshold.

Neither argument withstands scrutiny. Courts have uniformly agreed that major modification status must initially be determined before construction *and* that EPA can bring an enforcement case where a source unreasonably concluded that NSR did not apply. U.S. Br. 11-12, 43-44. The Clean Air Act requires operators to take preconstruction steps for major modifications; applicability cannot wait for post-construction data. This Court has already confirmed that EPA may enforce to ensure that operators' preconstruction analyses comply with the rules – including the demand growth exclusion at issue here.

Ultimately, DTE's arguments are inconsistent with the statute, the regulations, and common sense. Dismissing the United States' action here at the summary judgment stage – as the district court did – would allow a source to bypass preconstruction permitting merely by asserting it complied with the regulations. As this Court warned, "if EPA were barred from challenging preconstruction projections that fail to follow regulations, New Source Review would cease to be a preconstruction review program." 711 F.3d at 649.

# I. POST-PROJECT EMISSIONS DATA ARE NOT THE SOLE DETERMINANT OF MAJOR MODIFICATIONS – EPA CAN ENFORCE WHEN A SOURCE REASONABLY SHOULD HAVE OBTAINED A PERMIT BEFORE CONSTRUCTION

The foundation of DTE's argument on appeal is that post-project data dictate whether a project is a major modification. That proposition is inconsistent with this Court's prior opinion, the Act, and the regulations.

## A. Contrary To DTE's Assertion, This Court Did Not Find That Only Post-Project Data Could Show A Project Is A Major Modification

DTE argues that this Court previously decided that post-project data determine whether a project is a major modification. Brief of Defendant-Appellees ("DTE Br.") at 47. The company points to two aspects of the prior opinion for support: first, the statement that EPA can enforce if post-project emissions show an increase; and, second, the caution against EPA second-guessing. *Id*. at 47, 49. Neither statement goes as far as DTE suggests. Moreover, the company's reading would contradict this Court's holding that EPA can enforce to "ensure that the projection is made pursuant to the requirements of the regulations." 711 F.3d at 652.

This Court never said that *only* post-project data result in liability. Instead, it held that EPA could enforce without such data. *Id*. As Judge Batchelder noted in dissent in the prior appeal, the Court knew that post-project data showed an emissions decrease, and yet the panel majority remanded for further proceedings.

3

711 F.3d at 652-53. If this Court held what DTE asserts, there would have been no reason for that remand. DTE's reading would make preconstruction projections all but unreviewable and this Court's prior remand seemingly hollow.

Instead, the prior opinion shows the Court understood that EPA could determine a proposed project's major modification status before construction. The Court explained that where a source failed to follow the rules, "EPA must be able to prevent construction. . ." *Id*. at 650. That authority flows from the Act, which directs EPA to act to "prevent the construction or modification . . . which does not conform to the requirements." *Id*. (quoting 42 U.S.C. § 7477). For EPA to fulfill that statutory responsibility, it must have the authority to determine a modification before construction. Thus the Act's "clear" language means that DTE's reading – that only post-project data results in a major modification – cannot be correct. *See id*.

## B. The Clean Air Act Establishes That NSR Applicability Must Be Determined Before Construction And That EPA Can Enforce Where A Source Should Have Expected Emissions To Increase

DTE's interpretation of this Court's prior opinion puts that decision at odds with the consensus of federal courts. As explained in our opening brief, the statute forbids sources from constructing or modifying without complying with the preconstruction NSR requirements and gives EPA authority to enforce those provisions. U.S. Br. 43-44. Our opening brief then showed that reviewing courts

have reached consensus on two critical points:

- When a source should have obtained a permit based on a preconstruction analysis, it violates NSR at the time of construction. *Id.* (citing cases from six courts of appeals).

- Proving such a violation requires looking at what the operator "expected, *or should have expected* . . . at the time of the projects." *See, e.g.*, *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (emphasis added); *see also* U.S. Br. 11-12 (citing cases from Supreme Court, two courts of appeals, and five district courts).

In response, DTE never mentions most of the cases and simply claims that the United States' cited cases involve prior versions of the rules. DTE Br. 51-52. But the cases all relied on the unchanged language of the Act itself, not the regulations. The Act is clear. As the D.C. Circuit explained in a case after the 2002 Rules, Clean Air Act Section 165(a) "unambiguously prohibit[s] a major emitting facility from commencing construction without a PSD permit . . . and § 167 unambiguously authorize[s] EPA to enforce that prohibition." *Texas v. E.P.A.*, 726 F.3d 180, 190 (D.C. Cir. 2013) (overturned in part on other grounds by *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2443 (2014)).

Rather than engage with these cases, the company argues that courts have changed course and rejected EPA enforcement against unreasonable source

projections "in each case brought under" the 2002 Rules. DTE Br. 52. But neither case DTE cites – this Court's prior opinion and an unpublished district court decision – supports its claim, and the company ignores other cases under the 2002 Rules that do support EPA enforcement. As described above, this Court's prior decision does not preclude EPA enforcement; it held that enforcement was necessary for NSR to function. In the other case DTE cites, *United States v. Okla. Gas & Elec.*, EPA did not seek a ruling that the project was a major modification, but only a declaratory judgment that the source's projection was improper. No. CIV-13-690-D, 2015 WL 224911, at \*10 (W.D. Okla. Jan. 15, 2015). The court found that it lacked jurisdiction and never addressed whether a claim like the one at issue here was proper under the rules. *Id*. at \*11.

In addition to relying on cases that do not support its position, DTE ignores three other relevant decisions. In addition to *Texas v. E.P.A.*, cited above (and in our opening brief), two district court decisions under the 2002 Rules acknowledge EPA's authority to determine whether projects constituted modifications at the time of construction. *See United States v. Ameren Mo.*, No. 4:11 CV 77 RWS, 2012 WL 262655, at \*5 (E.D. Mo. Jan. 27, 2012) (in case where EPA alleged past projects were major modifications based on what source should have expected at construction: "Either the Projects were major modifications or they were not. If the Projects were major modifications, Ameren should have undergone a BACT

6

determination and obtained a PSD permit."); *United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d. 1106, 1113 (D. Minn. 2010) (in case where EPA sought information to determine major modification status before construction, finding Section 167 gives EPA "authority . . . to prevent through appropriate legal remedies, violations committed before construction commences").

DTE also ignores the most relevant portions of the statute. The company never references Section 165, the provision containing the substantive preconstruction permitting requirements, or Section 167, the program-specific enforcement provision. As the case law noted above explains, those statutory provisions establish NSR as a preconstruction program where EPA can enforce against sources that fail to perform a reasonable projection of post-project emissions. DTE cannot reconcile those key statutory provisions with its argument that only post-project data results in a major modification. In contending that our discussion of the "preconstruction nature of NSR" is a non sequitur, DTE Br. 50 (citing U.S. Br. 42-54), the company ignores the cardinal rule of interpretation: begin with the statutory text. *See, e.g.*, *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685 (1985).

DTE does point to one sentence from the statute: the modification definition. Under that definition, any physical change that "increases the amount of" any air pollutant is a modification. 42 U.S.C. §§ 7411(a)(4), 7479(2)(C). DTE suggests

that the use of the present tense verb "increases" means only actual data can demonstrate whether a modification occurred. But the judicial consensus noted above refutes that argument. No court has adopted DTE's reading of the modification definition. To the contrary, in generally upholding the 2002 Rules, the D.C. Circuit recognized that the statutory modification definition was implemented based on projected emissions and was enforceable by EPA. *New York v. EPA*, 413 F.3d 3, 33-36 (D.C. Cir. 2005) (remanding recordkeeping rules to EPA to ensure "enforceability" of actual to projected-actual analysis); *see also* 1 U.S.C. §1 (known as the Dictionary Act, supplying rules of interpretation for federal statutes: "words used in the present tense include the future as well as the present").

### C. The Regulations Do Not Support DTE's Arguments; Instead They Confirm That EPA Intended Continued Enforcement Based On Preconstruction Analyses

#### 1. *DTE's regulatory argument relies on an incorrect reading of three sentences from the 2002 Rules*

DTE argues that the 2002 Rules "state unambiguously" that only post-project data can result in a major modification. DTE Br. 66 (citing 40 C.F.R. § 52.21(a)(2)(iv)(*a*)). The company cites three sentences from 40 C.F.R. § 52.21(a)(2)(iv)(*a*) and (*b*) that EPA added in 2002. This argument was thoroughly briefed in the prior appeal. *See* Case No. 11-2328, DTE Brief at 30-39; Case No. 11-2328, U.S. Reply Brief at 5-19. On that record, the Court implicitly rejected

DTE's argument. The Court never mentioned DTE's reading of Subsection

52.21(a)(2)(iv), and held that EPA enforcement was allowed without a post-project

emissions increase. 711 F.3d at 652.

DTE's regulatory argument is no more compelling now than it was three

years ago. At bottom, DTE's argument is that present tense verbs in Subsection

52.21(a)(2)(iv)(*a*) and (*b*) (*e.g.*, a project is a major modification if it "causes"

emissions increases) mean that the rules require increases proved by post-project

data rather than by projections.[1] *See, e.g.*, DTE Br. 29. That argument ignores a

basic canon of construction, the surrounding regulatory language, and EPA's clear

statements in the rulemaking record.

*First,* as noted above, an interpreting court typically reads present tense

verbs to include the future tense. *See, e.g.*, *Frederick v. Shinseki*, 684 F.3d 1263,

1270 (Fed. Cir. 2012) (noting 1 U.S.C. §1 and legislative drafting manuals used by

---

[1] The three sentences that DTE repeatedly excerpts are:

> The project is not a major modification if it does not cause a
> significant emissions increase. If the project causes a significant
> emissions increase, then the project is a major modification only if
> it also results in a significant net emissions increase.
>
>                    \*\*\*
>
> Regardless of any such preconstruction projections, a major
> modification results if the project causes a significant emissions
> increase and a significant net emissions increase.

40 C.F.R. § 52.21(a)(2)(iv)(*a*)-(*b*).

Congress). That rule of construction means that the rules' use of "causes" is equivalent to "causes or will cause." The verb tense that DTE relies on for its argument is thus perfectly consistent with determining liability based on a projection that the work "will cause" an increase.

*Second,* the regulatory provisions DTE cites show that a projection is contemplated. Subsection 52.21(a)(2)(iv)(*a*) incorporates the regulatory major modification definition, which applies to changes that "*would* result in" emissions increases. *See* 40 C.F.R. § 52.21(b)(2)(i) (emphasis added); *see also United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 865 (S.D. Ohio 2003) (relying in part on regulatory modification definition to find that preconstruction information controls applicability). Similarly, the term net emissions increase, used in Subsection 52.21(a)(2)(iv)(*a*) and (*b*), is defined based on "projected" emissions for existing units. *Id*. § 52.21(b)(3)(i)(*a*) and (a)(2)(iv)(*c*). The very emissions increases described in the provisions DTE cites include reliance on projections.

*Third*, EPA described Subsection 52.21(a)(2)(iv) as a "roadmap" intended only to clarify where to find the operative requirements of the rules. *See* 67 Fed. Reg. 80,186, 80,190 (Dec. 31, 2002). The language DTE relies on was not intended to change the substance of the rules. And DTE concedes that EPA enforcement of unreasonable projections was the law of the land before the 2002 Rules. *See* DTE Br. 15 (citing *United States v. Cinergy Corp.*, 458 F.3d 705, 709

(7th Cir. 2006), a case that specifically noted that it was interpreting the 1992 Rules); DTE Br. 51-52.

*Fourth,* EPA explained that the 2002 Rules made five changes to the preexisting rules. 67 Fed. Reg. at 80,190; *see also New York*, 413 F.3d at 16-17. EPA never described the changes as limiting its enforcement authority, and never put any such proposed change out for public comment, as required by law. *See* 42 U.S.C. § 7607(d) (Clean Air Act analog of Administrative Procedures Act). Thus there is no reason to conclude that EPA intended to curtail its authority from what DTE concedes was the pre-2002 status quo.

*Fifth*, courts interpret regulations to be consistent with the relevant statute. *See, e.g.*, *Progressive Corp. & Subsidiaries v. United States*, 970 F.2d 188, 192-93 (6th Cir. 1992) ("Wherever possible, courts should read regulations to be consistent with the statutes that authorize them, and a construction that thwarts the statute which the regulation implements is impermissible."); *see also United States v. Larionoff*, 431 U.S. 864, 873 (1977). As described above, the statute makes clear that modification status must first be assessed before construction and that EPA can enforce to require modifications to adhere to the preconstruction requirements. The NSR rules cannot "undercut Congress's mandate." *Texas v. E.P.A.*, 726 F.3d at 195.

*Finally*, DTE's reading of Subsection 52.21(a)(2)(iv) is internally

inconsistent. The company says that Subsection 52.21(a)(2)(iv)(*a*)-(*b*) means that post-project data, rather than projections, control modification status. *See, e.g.*, DTE Br. 29. But if that were true, sources would *never* have to obtain preconstruction permits, even when their own projections showed a triggering increase. That goes farther than even DTE now argues. *See* DTE Br. 26 (noting that when source projects increase, it must get a permit); *see also DTE Energy*, 711 F.3d at 647.

### 2.  *EPA confirmed in finalizing the 2002 Rules that it intended substantive review of source projections*

As noted above, DTE concedes that courts have settled that earlier versions of the rules allowed EPA enforcement based on what a source should have expected before construction. Nothing in the 2002 Rules ceded that authority. Instead, EPA confirmed that the agency planned to continue enforcing based on preconstruction modification determinations.

EPA has spoken on three principles relevant to this appeal. First, in publishing the 2002 Rules, EPA explained that NSR "[a]pplicability . . . must be determined in advance of construction." 67 Fed. Reg. at 80,188. Second, EPA added that NSR applicability would be subject to Agency review, including review of a source's emissions projection. "If you are subsequently determined not to have met any of the obligations . . . for example[,] . . . failure to properly project emissions . . . you will be subject to" enforcement. *Id.* at 80,190. Finally,

while sources need not get EPA approval before construction, EPA made clear that sources "proceed at risk" that EPA will "later find that [the source] made an incorrect determination." 68 Fed. Reg. 61,248, 61,250 (Oct. 27, 2003) (explaining sources' preconstruction options in preamble to rule concerning the routine maintenance exemption of NSR). Sources that fail to get "a preconstruction permit" when "required to do so" are subject to enforcement consequences including penalties and the requirement to install state-of-the-art pollution controls. *Id*. at 61,264.

These principles make clear that EPA can enforce against sources that failed to obtain preconstruction permits, and post-project data does not shield an operator from such enforcement. As EPA explained in 2002, "The NSR program remains a pre-construction review program" and "monitoring the quality of pre-construction projections is important." EPA Technical Support Document for 2002 Rules, RE 114-6, Page ID 4881.

### D. Deference Is Due To EPA As The Agency That Wrote The Rules And Has Been Charged With Supervising The New Source Review Program

DTE argues that *Auer* deference is not appropriate here because the regulatory language unambiguously states that only post-project data can result in modification status. DTE Br. 66. But the rules say no such thing, as explained above. To the extent the Court finds the provisions are ambiguous, which they are

not, *Auer* deference is warranted here. U.S. Br. 54-58.

DTE next claims that the EPA statements cited in our opening brief are "no more than post-hoc rationalizations" that merit no deference. This claim too is incorrect. As explained in our opening brief, EPA has spoken authoritatively on this issue: in the preamble and in the decision by the EPA Environmental Appeals Board. *Id*. EPA has stated that its rules do not preclude enforcement based on preconstruction analysis, and that the 2002 Rules involved only minor changes for sources like DTE. DTE does not challenge the substance of these EPA statements.

Instead, the company attempts to dismiss the preamble to the 2002 Rules because it "says nothing about second-guessing." DTE Br. 67-68. But what DTE calls impermissible second-guessing had been lawful for decades. *See, e.g.*, *United States v. La.-Pac. Corp.*, 682 F. Supp. 1141, 1166 (D. Colo. 1988); DTE Br. 15 (noting judicial understanding of earlier rules). EPA made clear that its enforcement efforts would continue, *see* pp. 12-13, and stressed that the 2002 Rules made only "minor changes" for sources like DTE. *DTE Energy*, 711 F.3d at 646 (citing 67 Fed. Reg. at 80,192). In defending the 2002 Rules, DTE's trade group told the D.C. Circuit that a source could be liable if EPA disagreed with its projection. *See* U.S. Br. 45-46. DTE's trade group even cited the *Ohio Edison* decision in explaining how the program works. Joint Brief of Industry Intervenors, *New York v. EPA*, No. 02-1387, 2004 WL 5846442, at *7-*8 (D.C. Cir. Oct. 26,

14

2004). *Ohio Edison* made clear that preconstruction information can result in NSR applicability. *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 865, 881-82 (S.D. Ohio 2003).

DTE then notes that the EPA Environmental Appeals Board's decision was overturned on appeal. DTE Br. 68. The Board's decision came after TVA challenged an administrative compliance order issued by EPA. *See Tenn. Valley Auth. v. Whitman*, 336 F.3d 1236, 1239 (11th Cir. 2003). The Eleventh Circuit held that the administrative compliance order was not a final agency action and so the court had no jurisdiction to review it. *Id*. Notably, the court added that EPA's proper course was to file just the kind of enforcement action it filed here. *Id*. at 1239-40; *see also id*. at 1260 (Barkett, J., specially concurring).

Ultimately, the statute and regulations make clear that NSR is a preconstruction program and that EPA can enforce based on preconstruction analysis. If any doubt remains, the Court should defer to EPA's construction of the program. After all, Congress "'lodge[d] in the Agency encompassing supervisory responsibility over the construction and modification of pollutant emitting facilities in areas covered by the PSD program.'" *DTE Energy*, 711 F.3d at 650 (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 484 (2004)).

## II. EPA ENFORCEMENT IS APPROPRIATE HERE BECAUSE DTE FAILED TO COMPLY WITH THE REGULATIONS

To the extent it accepts that any enforcement is possible, DTE reduces such enforcement to insignificance by contending that a source need only satisfy the most elementary requirements of the rules. In DTE's view, EPA could intervene if a source made a careless mistake, like using the wrong significance threshold, but not if the source presented a farcical demand growth analysis – just as DTE did here. That view misreads this Court's prior opinion and would make NSR essentially unenforceable for existing sources.

Here, DTE failed to comply with the regulations before beginning the Monroe 2 overhaul. At the very least, there is a dispute over whether DTE's NSR analysis followed the requirements of the rules. To dismiss the case at summary judgment on such a record would allow a source to preclude any judicial review merely by saying it complied with the rules.

### A. The Court Held That EPA Could Enforce The Regulations, Specifically Including Substantive Provisions Like The Demand Growth Exclusion

#### 1. *Contrary to DTE's argument, nothing in the Court's prior opinion limits EPA to enforcing just a subset of the NSR regulations*

DTE argues this Court's prior opinion means that EPA may only enforce the "objective requirements" or "specific instructions" of the regulations. DTE Br. 1, 4. The company contends that the Court's examples of potential

enforcement and its cautions against second-guessing amount to a holding that only part of the regulations are enforceable. Read in full, however, the prior opinion makes clear that EPA may enforce all the regulations, not merely a subset.

As an initial matter, DTE does not use the term "objective" in the traditional legal sense. The classic objective standard – looking to what a reasonable person would expect – is what courts have applied in prior NSR enforcement actions and what DTE is strenuously trying to avoid. *See* U.S. Br. 11-12, 29-30. Instead, DTE uses objective to mean the most elementary requirements: errors such as using the wrong significance threshold. Ignoring the agency's "encompassing supervisory responsibility" over NSR applicability, DTE seeks to reduce EPA to merely double-checking that the simplest requirements are followed. *See DTE Energy*, 711 F.3d at 649-50 (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 484 (2004)). The result would be a comprehensive set of rules in which most provisions are unenforceable.

Nothing in the Court's prior opinion supports such a result. DTE's argument begins with the Court's phrase "specific instructions." *See, e.g.*, DTE Br. 4. But the Court used the phrase "specific instructions" not in describing a *limit* on EPA's enforcement authority but in describing the rules themselves: "The 1992 and 2002 changes to New Source Review regulations take a middle road by trusting

17

operators to make projections but giving them specific instructions to follow."
711 F.3d at 649. The Court did not limit enforcement to a subset of the
regulations; it merely stated that the rules provide specific instructions to
sources.

In addition to relying on a misunderstanding of this Court's prior
opinion, DTE's argument that some aspects of the regulations are too general to
be enforced is wrong as a matter of "long-settled" administrative law. *United
States v. Cinemark*, 348 F.3d 569, 580 (6th Cir. 2003). "An agency's
enforcement of a general statutory or regulatory term against a regulated party
cannot be defeated on the ground that the agency has failed to promulgate a
more specific regulation." *Id*. (citing *SEC v. Chenery*, 332 U.S. 194, 201
(1947)). That long-settled principal refutes DTE's argument.

DTE also relies on the Court's language regarding second-guessing and
the potential for an over-intrusive EPA review becoming a *de facto* prior
approval program. *See, e.g.*, DTE Br. 55-56. But to read that language as a limit
on what rules EPA may enforce cannot be squared with the rest of the opinion.
The Court's holding is clear: EPA can enforce to ensure compliance with the
regulations. 711 F.3d at 652. There is nothing inconsistent about a program
where sources need not get prior approval for a given action, but are subject to
enforcement if they proceed when they should have sought a permit. *See, e.g.*,

*Sasser v. Adm'r, U.S. E.P.A.*, 990 F.2d 127, 130-31 (4th Cir. 1993) (individual seeking to fill wetlands need not obtain approval beforehand, but "bears the risk of liability for rectifying the harm done if in fact the discharge is not permitted."). For NSR, one needs a permit where a projection done in accordance with the regulations shows an increase in emissions. *DTE Energy*, 711 F.3d at 647. EPA has explained since the beginning of the program that preconstruction notice is generally not required, but that a source that "improperly avoids review" violates the rules and will be subject to enforcement. *See* 45 Fed. Reg. 52,676, 52,725 (Aug. 7, 1980); *see also* pp. 12-13.

The prior opinion carefully walked through the scope of the regulatory requirements, and the holding establishes those are within EPA's enforcement authority. 711 F.3d at 652. The Court noted that the NSR requirements EPA may enforce "include making projections." *Id*. at 650. The Court added that the rules "also instruct operators to consider all relevant information . . . and to exclude post-project emissions that could have been accommodated during the baseline period and are unrelated to the project." *Id*. These are the very provisions that DTE now says are too subjective to support an EPA enforcement action. This Court specifically noted them as requirements and concluded that, "EPA's enforcement powers must also extend to ensuring that operators follow the

requirements in making those projections." *Id*.

Given the Court's careful recitation of the requirements, the fact that it provided examples of elementary mistakes where EPA enforcement would be needed does not limit enforcement to similarly clear errors. *Contra* DTE Br. 41. The Court stated that the examples were just that. 711 F.3d at 650. And the examples came after sentences explaining that the rules include requirements to:

- "mak[e] projections;"

- "consider all relevant information;" and

- "exclude post-project emissions that . . . are unrelated to the project."

*Id*. These too are part of the regulatory requirements that must be enforceable for NSR to remain a preconstruction program – and are precisely the provisions EPA seeks to enforce here.

Ultimately, the Court's prior opinion noted a balance in the rules. EPA may not turn NSR into a prior approval scheme by "second-guessing" a reasonable projection; but a source may not use an unreasonable projection to bypass the preconstruction requirements. An unreasonable projection is akin to no projection at all: "If there is no projection, or the projection is made in contravention of the regulations guiding how the projection is to be made, then the system is not working." *DTE Energy*, 711 F.3d at 649. Thus a projection that

deviates from the rules – any part of the rules – gives rise to an enforcement action. Such an enforcement action does not implicate the Court's concerns about making NSR a *de facto* prior approval program because it is premised on the source's failure to follow the rules. As described below, such an action is not second-guessing.

> 2. *In an analogous NSR decision, the Supreme Court confirmed that EPA can review to ensure determinations are reasonable; such review is not 'second-guessing'*

Contrary to DTE's reading, second-guessing is not simply a synonym for review. If it were, there would have been no purpose for the Court to remand in the prior appeal. Where a source "expected, or should have expected, that its modifications would result in a significant net emissions increase" the United States may prove that a reasonable projection would result in a major modification. *See United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013). Such a review is not second-guessing. After all, this Court explained that a projection that fails to follow the rules is no better than no projection at all. 711 F.3d at 649.

The Supreme Court reached just this conclusion in an analogous case. In *Alaska Dep't of Envtl. Conservation v. EPA*, the state issued an NSR permit, and EPA challenged the pollution controls required by the permit as insufficient. 540 U.S. 461 (2004). An NSR permit requires the source to apply the best available pollution control, known as BACT. The permitting authority (there an Alaska state

agency) determines BACT by weighing certain factors laid out in the statute and regulations. Just as DTE argues here that EPA may only review the most basic requirements of the rules, the operator in *Alaska* argued that EPA could not interfere so long as the permit contained a BACT limit established by the State. *Id.* at 488.

The Supreme Court rejected the operator's argument. The Court noted that Congress "vested EPA with explicit and sweeping authority to enforce [Clean Air Act] 'requirements' relating to the construction and modification of sources." *Id.* at 490. Given that authority, the Court rejected the contention that EPA had a merely ministerial review function:

> We fail to see why Congress, having expressly endorsed an expansive surveillance role for EPA in two independent CAA provisions, would then implicitly preclude the Agency from verifying substantive compliance with the BACT provisions and, instead, limit EPA's superintendence to the insubstantial question whether the state permitting authority had uttered the key words "BACT."

*Id.* The Court affirmed EPA's ability to rule on the reasonableness of a state's BACT determinations and to evaluate whether the state's conclusion "was made on reasonable grounds properly supported by the record." *Id.* at 490, 495. Notably, a BACT determination often requires exercise of judgment by the permitting authority, but the Court found EPA review appropriate nonetheless. *Contra* DTE Br. 73. And the Court accepted that review was not second-guessing when the agency challenged a decision that was "not based on a reasoned

22

analysis." *Id.* at 490-91 (internal citations omitted).

The same principles apply with greater force here. It would be odd, to say the least, for EPA to have more authority to review a state's conclusion under the Act than an operator's conclusion. That is the result DTE seeks, however. The logic of the Supreme Court's opinion dictates that EPA be able to review a source's projection to ensure that it is "reasonably moored" to the requirements. *Id.* at 485. This is precisely what this Court held in its prior opinion.

### B. DTE Failed To Comply With The Regulations Here, Making EPA Enforcement Appropriate

DTE contends that even if EPA has authority to enforce the regulations in full, DTE complied with the rules here. DTE Br. 54-63. To the contrary, the evidence shows that DTE cannot successfully invoke the demand growth exclusion. Moreover, at the summary judgment stage, there is at least a genuine dispute over whether DTE complied with the rules. The United States seeks to have a fact-finder determine whether DTE should have expected an emissions increase. *See United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013). If DTE can block any such action simply by its own say-so, NSR will "cease to be a preconstruction review program." *DTE Energy*, 711 F.3d at 649.

Our initial brief explained that DTE failed to comply with the regulations in

23

two ways.[2] *See* U.S. Br. 32-39. First, the company failed to craft an "accurate projection" based on "all relevant information." The company began with its self-declared "best estimate" computer modeling, which predicted a pollution increase of several thousand tons. Instead of using that modeling to determine how much of the increase was related to the overhaul, DTE simply excluded all of the increase with a boilerplate explanation. That led to the second violation of the regulations: DTE excluded an emissions increase that its modeling said was related to the project.

DTE tries to minimize those undisputed facts by describing them as the "methodology" of United States' expert witness Philip Hayet. *See, e.g.*, DTE Br. 56. The company accuses the United States of "[o]bstinately pushing its experts'" projections rather than acceding to DTE's analysis. This is a red herring. Mr. Hayet, the government expert DTE cites, does not have his own methodology or his own projection. He merely explained what DTE's computer modeling showed. U.S. Br. 36. As described in our opening brief, one can take DTE's model and remove the effect of the project, thus isolating the emissions specifically resulting from the work. *Id*. The result is a large emissions increase. *Id*. This is simply a

---

[2] DTE suggests that the United States alleged three violations of the rules. *See, e.g.*, DTE Br. 6. Our opening brief made clear it was two. U.S. Br. 39; *see also id*. at 33 n.7 (acknowledging district court finding that DTE's notice satisfied the rules).

statement of fact: DTE's computer model predicted an emissions increase related to the project. Tellingly, DTE never says that Mr. Hayet was wrong; it just accuses him of second-guessing. But explaining what DTE's model shows can hardly be called second-guessing. *See Alaska Dep't of Envtl. Conservation*, 540 U.S. at 490-91.

DTE has never provided a demand growth analysis that is "reasonably moored" to the regulations. *See id.* at 485. Before the project, the company excluded the entire projected increase as a matter of standard operating procedure, not analysis. U.S. Br. 14. DTE asserts that it is "simply wrong to suggest" that DTE's demand growth claims stemmed from a "belief" that such projects could not trigger NSR. DTE Br. 65. But that is precisely what the company's lead engineer said. *See* U.S. Br. 33. And that engineer performed the company's NSR analysis. *See* Boyd Deposition Excerpts, RE 115-4 (Sealed), Transcript pp. 219-220. As noted in our opening brief, DTE's notice letter to the state was empty boilerplate, and DTE does not challenge that fact. U.S. Br. 14, 32-33.

In response, DTE seeks to change the subject. The company now argues that other computer modeling – including modeling done after the project began – shows that the increases the company predicted were due to other factors. DTE Br. 64-65. DTE says the decrease in post-project emissions shows the same thing. *Id.* at 64. But neither the additional modeling runs nor the post-project data changes

25

that the computer modeling DTE actually relied on for its NSR projection showed an increase related to the project.

At most, the post-hoc modeling runs and actual data show that demand also affects emissions. (Of course it does.) If all that is required to invoke the demand growth exclusion is asserting an emissions increase is related to demand, the exclusion would swallow the rule. All production responds to demand. Allowing sources to exclude increases caused by a combination of demand and the project, would mean a "per se exclusion for demand growth," a reading of the rule the D.C. Circuit rejected. *New York v. EPA*, 413 F.3d 3, 32-33 (D.C. Cir. 2005).

DTE's own predicted increase here was a product of *both* demand and improved unit availability due to the project. As explained in our opening brief, increases caused by the combined effect of the project and other factors are related to the project and cannot be excluded under the rules. U.S. Br. 34-35. Here improved unit availability allowed DTE to pollute more than it otherwise would have for any level of demand. *Id*. at 36-37.

DTE also disputes the proper interpretation of the demand growth exclusion. DTE Br. 58-60. The law is clear, however. The 2002 Rules require a source to satisfy two prongs of the exclusion for it to apply. 40 C.F.R. §52.21(b)(41)(ii)(*c*); *New York*, 413 F.3d at 33 (identifying two criteria a source must meet to exclude emissions increase). In upholding that aspect of the rules, the D.C. Circuit

emphasized that it applies only "so long as the growth is unrelated to the change." *New York*, 413 F.3d at 32-33. In an applicability determination, EPA confirmed that unrelated means "completely unrelated." EPA Northampton Letter, RE 114-7, Page ID 4895.

Ultimately, DTE's post-construction efforts to bolster its NSR analysis are unconvincing. They are also irrelevant at this stage of the case. At summary judgment, the Court must take as true the United States' evidence that (1) DTE's own modeling shows an emissions increase related to the project and (2) DTE concluded that NSR did not apply based on its "belief" that such projects cannot trigger NSR. To grant summary judgment on that record would allow a source to merely assert that NSR does not apply without fear of enforcement based on preconstruction analysis. If a source can forgo permitting without consequence, then "NSR would cease to be a preconstruction review program." *DTE Energy*, 711 F.3d at 649.

## C. Limiting Enforcement To Only The Most Basic Regulatory Requirements Would Result In A Voluntary NSR Program For Existing Sources

New Source Review has operated as a preconstruction program for nearly four decades. To implement the statutory requirements, EPA developed a comprehensive set of rules guiding the preconstruction modification analysis. DTE's argument is inconsistent with that program. By claiming that EPA can

enforce only the most elementary requirements, DTE would essentially transform NSR into a voluntary program (for existing sources).

The company says that the projection itself and the demand growth exclusion must be left to the source's unfettered discretion. *See, e.g.*, DTE Br. 24-25, 56. If true, any existing source could bypass preconstruction permitting – as DTE did here – by claiming no increase and simply waiting to see if emissions go up. But EPA "cannot reasonably rely on a utility's own unenforceable estimate of its annual emissions" if NSR is to remain a preconstruction program. *See Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 917 (7th Cir. 1990). DTE's hollowing out of the preconstruction requirements is precisely what the Court's prior opinion guarded against: "if EPA were barred from challenging preconstruction projections that fail to follow regulations, New Source Review would cease to be a preconstruction review program." 711 F.3d at 649. DTE's approach thwarts the Act's purpose of evaluating any potential increases in air pollution and installing controls at the time of construction, when doing so would be most efficient. U.S. Br. 5-6, 52-54.

Providing a free pass from preconstruction permitting would be troubling enough, but the effects of DTE's argument go farther. DTE says that without specific instructions on how the demand growth exemption applies, EPA must defer to the source's judgment. If accepted, that argument would seemingly be

28

equally applicable to assessing compliance based on *post*-construction data; the regulations provide no greater specificity for determining related emissions increases there. So even in a case where emissions eventually increase after the work, under DTE's theory it could still preclude any review merely by saying that the increase was unrelated to the project. Because DTE has consistently claimed that all increases are due to demand rather than its construction projects, the company is essentially arguing for a comprehensive free pass from the NSR program based on its own say-so.

### III. EPA HAS PROPERLY ALLEGED THE MONROE UNIT 2 OVERHAUL WAS A MAJOR MODIFICATION; THE APPROPRIATE REMEDY IS FOR DTE TO OBTAIN PERMITS AND INSTALL POLLUTION CONTROLS

The Court has already confirmed that EPA may pursue enforcement actions based on preconstruction analyses. In those actions, a violation first occurs when the source begins construction without a permit. *See* U.S. Br. 43-46. The remedy is for the source to go through the NSR process – including public review, analysis of effects on air quality, and applying pollution controls – just as it ought to have done before beginning construction. *See* 67 Fed. Reg. at 80,190 (noting remedy in enforcement action can include penalties and pollution controls); U.S. Br. 48. DTE does not respond to this aspect of the United States' brief.

DTE's notice argument rests on the claim that only post-project data can result in a major modification. *See* DTE Br. 70. Based on that foundation, DTE

argues that the United States cannot allege a major modification, but only a violation of the projection regulations that would result in, at most, a minor civil penalty and requirement to re-do the projection. *Id*. at 70-72. DTE's premise is wrong; the United States can prove a project is a major modification based on what the source should have expected before construction. *See* Section I. The United States provided proper notice of that claim. *See* U.S. Br. 38 n.8.

## CONCLUSION

For the foregoing reasons and those in our opening brief, this Court should reverse the grant of summary judgment and remand for further proceedings.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General

*/s/ Thomas A. Benson*
THOMAS A. BENSON
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-5261

April 3, 2015

## CERTIFICATE OF COMPLIANCE
## WITH TYPE VOLUME LIMITATION

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 6,898 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(b)(1). The brief

complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type

style requirements of Fed. R. App. P. 32(a)(6) because I prepared it in a

proportionally spaced typeface using 14-point Times New Roman type.

*/s/ Thomas A. Benson*
THOMAS A. BENSON
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-5261

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing brief upon counsel of record using the Sixth Circuit's electronic case filing system.

In addition, I served a copy of the foregoing brief by email upon counsel in the related appeal, No. 14-2275:

Shannon Fisk
Mary Whittle
Earthjustice
1617 John F. Kennedy Blvd.
Suite 1675
Philadelphia, PA 19103

/s/ Thomas A. Benson
THOMAS A. BENSON
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-5261

April 3, 2015